# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | | |
|---|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, as an organization; GEORGIA COALITION FOR THE PEOPLES' AGENDA, as an organization; MERRITT HUBERT, TAURUS HUBERT, JOHNNY THORNTON, MARTEE FLOURNOY and LARRY WEBB; | ) ) ) ) ) ) | Civil Action Case No. ___5:15-cv-414 CAR |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| HANCOCK COUNTY BOARD OF ELECTIONS AND REGISTRATION; KATHY RANSOM, NANCY STEPHENS, LINDA CLAYTON, ROBERT INGRAM, and JIM YOUMANS, in their official capacities as members of the Hancock County Board of Elections and Registration; and TIFFANY MEDLOCK, in her official capacity as the Hancock County Elections Supervisor, | ) ) ) ) ) ) ) ) ) | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** **(52 U.S.C. § 10101, 52 U.S.C. § 10301, 42 U.S.C. § 1983; Fourteenth Amendment to the United States Constitution)** |
| Defendants. | ) ) ) | |

_____

## PRELIMINARY STATEMENT

1.  This action concerns a series of improper and racially biased challenges and purges of

Black registered voters from the Hancock County voter registration list by the majority-white

Hancock County Board of Elections and Registration (BOER) in advance of the City of Sparta's

1

municipal election scheduled for November 3, 2015, in violation of the Voting Rights Act of 1965, the Civil Rights Act of 1964, and the United States Constitution.

2.   The BOER conducted at least 12 voter challenge hearings between approximately August and October 2015, according to available evidence.  Acting through its members and staff, and with the cooperation of others, the BOER challenged approximately 174 voters, representing more than 17 percent of the 988 registered voters in the City of Sparta.  Nearly all of those voters are Black.

3.   The hearings conducted in furtherance of these disproportionate challenges of Black registered voters were a sham, because they were conducted in an arbitrary manner and without consistent criteria or procedures.  The procedures were adopted, at least in part, for the purpose of removing Black Sparta voters from the registration list, thereby benefiting white and white-preferred mayoral and city council candidates in the Sparta municipal election.

4.   The strategy of challenging Black voters first began by and within the BOER itself, with Vice Chair Nancy Stephens working in tandem with certain BOER members and county elections officials.  Having made the challenges to Black voters, Vice Chair Stephens would then vote on her own challenges.

5.   Vice Chair Stephens, who is white, ceased challenging voters after concerns were raised about the propriety of her personally filing challenges and then voting upon those challenges as a BOER member.

6.   The BOER then changed its strategy and began cooperating with a white non-board member named Don Bevill, who made more than 100 challenges to Black electors.  Mr. Bevill filed his challenges in a format that closely resembled the format of those filed by the Vice Chair.

2

7.   Not only were Black voters specifically targeted, but the challenge and removal hearings were conducted in a manner that stacked the deck against them.  In these hearings, the BOER and Mr. Bevill consistently failed to provide credible evidence based upon personal knowledge that the challenged voters were not qualified to vote.  The BOER frequently accepted hearsay, speculation, and unsubstantiated rumors provided by unnamed witnesses and anonymous individuals as sufficient evidence to remove registered Black voters from the registration list.

8.   As a result of the challenge and removal proceedings, Plaintiffs are informed and believe and thereon allege that legally qualified Black voters have been improperly stricken from the voter rolls, according to available evidence. Another group of Black voters is being required to appear at the BOER office to provide proof of residency before they can vote.

9.   A Black voter, Plaintiff Larry Webb, witnessed the efforts of the BOER and its collaborators to purge Black voters from the registration list.  In an effort to determine whether the BOER would apply consistent standards, he challenged 27 predominantly non-Black registered voters whom he believed to be ineligible to vote.  These challenges were treated with obvious and documented disapproval of certain members of the BOER.  White members of the BOER sought to thwart his efforts and imposed different standards upon his challenges than those made against the eligibility of Black voters.

10. The racially biased and improper challenges and consequent removal of Black voters from the Hancock County registration list gives rise to claims by Plaintiffs and similarly situated voters under the Voting Rights Act of 1965, the Civil Rights Act of 1964, and the United States Constitution, which justify the imposition of appropriate preliminary injunctive relief, and permanent declaratory and injunctive relief.

## JURISDICTION AND VENUE

11. This case arises under the Constitution and laws of the United States.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1345; 52 U.S.C. § 10301(a) and (b); and 42 U.S.C. § 1983.  This Court has jurisdiction to grant both declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred, and are occurring, in Hancock County, Georgia.

## PARTIES

13. Plaintiff Georgia State Conference of the NAACP is a non-partisan, interracial, non-profit membership that was founded in 1941 in Savannah, Georgia.  Its mission is to eliminate racial discrimination through democratic processes and ensure the equal political, educational, social, and economic rights of all persons, in particular African-Americans.  It is headquartered in Atlanta, includes 127 branches in most Georgia counties, and currently has approximately 10,000 members.

    a.   The Georgia NAACP's support of voting rights has been central to its mission, and the Georgia NAACP has participated in numerous lawsuits vindicating those rights.  *See*, *e.g.*, *Ga. State Conf. of the NAACP v. Fayette County Bd. Of Com'rs*, 2015 WL 4633575 (N.D. Ga. Aug. 3, 2015); *Ga. State Conf. of the NAACP v. Kemp*, 841 F.Supp.2d 1320 (N.D. Ga. 2012).  The Georgia NAACP also engages in efforts to register Black citizens to vote and to encourage Black registered voters to turn out to vote.

4

b.   The Georgia NAACP's membership includes Black registered voters residing in Hancock County and the City of Sparta whose right to vote has been abridged or is at risk of being abridged in the future.

c.   The BOER's challenge and removal procedures are causing and will continue to cause the Georgia NAACP to divert a portion of its financial and other organizational resources to educating voters about challenges to their eligibility to vote and assisting them in their defense.  As a result, the Georgia NAACP is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration drives and get-out-the-vote ("GOTV") efforts.

14. The Georgia Coalition for the Peoples' Agenda ("GCPA") is a Georgia not-for-profit corporation with its principal place of business located in Atlanta, Georgia.  The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000 individual members.  The organization encourages voter registration and participation, particularly among minority and low-income citizens.

a.   The GCPA's support of voting rights is central to its mission.  The organization has committed, and continues to commit, time and resources to conducting voter registration drives and GOTV efforts in Hancock County since 2008 or earlier.  In 2014, for example, the GCPA conducted training sessions on voter registration, voter education, voter ID, Souls to the Polls, and other GOTV efforts in Hancock County.  The organization is planning to launch a "Post the Peach" initiative to encourage turnout in the county.

b.   The BOER's challenge and removal procedures are causing and will continue to cause the GCPA to divert a portion of its financial and other organizational resources to educating voters about the challenges and assisting them in their defense.  As a result, the

GCPA is limited, and will continue to be limited, to devoting fewer resources to its other organizational activities, including voter registration drives and GOTV efforts. GCPA staff has attended several challenge hearings and educated individuals and organizations in Hancock County regarding how to provide assistance to challenged voters.

15. Plaintiffs Merritt and Taurus Hubert are qualified and registered to vote in the State of Georgia. Their residence, as defined in O.C.G.A. § 21-2-217(a), is located in Sparta, Hancock County. Plaintiffs Merritt and Taurus Hubert are brothers, and they are Black.

16. Plaintiff Johnny Thornton is qualified to vote in the State of Georgia. His residence, as defined in O.C.G.A. § 21-2-217(a), is located in Hancock County. Plaintiff Thornton is Black.

17. Plaintiff Larry Webb is qualified and registered to vote in the State of Georgia. His residence, as defined in O.C.G.A. § 21-2-217(a), is located in Hancock County. He is a lifelong resident of the county. Plaintiff Webb is Black.

18. Plaintiff Martee Flournoy is qualified and registered to vote in the State of Georgia. His residence, as defined in O.C.G.A. § 21-2-217(a), is located in Sparta, Hancock County. Plaintiff Flournoy is Black.

19. Defendant Board of Elections and Registration of Hancock County ("BOER"), created by the Georgia General Assembly in 2011, is the governmental entity charged with conducting elections in Hancock County. 2011 Ga. Laws 3710. Two members are appointed by the Hancock County Republican Executive Committee, two members are appointed by the Democratic Executive Committee, and one member is appointed by the Chief Judge of the Superior Court of Hancock County. *Id*. § 3.

20. Defendants Kathy Ransom, Nancy Stephens, Linda Clayton, Robert Ingram, and Jim Youmans are members of the BOER. They are being sued in their official capacities in

connection with actions taken under color of law.  Defendant Ransom is the Chairperson,

Defendant Stephens is the Vice Chair, and Defendant Youmans is the Secretary of the BOER.

Defendants Ransom, Stephens, and Youmans are white, and Defendants Clayton and Ingram are

Black.

21. Defendant Tiffany Medlock is the Hancock County Elections Supervisor and is being

sued in her official capacity.  As Elections Supervisor, Defendant Medlock's duties include

supervising, directing, and controlling the administration of the affairs of the BOER, pursuant to

the BOER's duly adopted resolutions and state and federal law.  *Id*.  Defendant Medlock is an

employee of Hancock County and is employed at the pleasure of the BOER.  *Id*.

## FACTUAL ALLEGATIONS

### History of discrimination in Hancock County and its ongoing effects

22. The actions that the BOER has undertaken to challenge Black electors occur in the

context of significant racial disparities in voter participation and socioeconomic status that are

the legacy of Hancock County's history of racial discrimination.

23. The 2010 Census indicates that Hancock County has a total population of 9,429, of whom

6,983 (74.1%) are Black and 2,300 (24.4%) are white.

24. Sparta is the seat of Hancock County, and the county's only incorporated municipality.

According to the 2010 Census, Sparta has a total population of 1,400.  The city has a voting age

population of 1,083, of whom 81.0 percent are Black and 16.3 percent are white.

25. According to the 2010 Census, Hancock County has the second-lowest per capita income

of any county in Georgia.  Nancy Badertscher & James Salzer, *Poor Schools still get the short

end*, The ATLANTA JOURNAL-CONSTITUTION, June 17, 2012, *available at*

http://www.ajc.com/news/news/local/poor-schools-still-get-the-short-end-1/nQWZk/.

26. According to the 2013 American Community Survey five-year estimate ("ACS"), there are significant racial disparities in income levels.  The median income in Black households in Hancock County is $22,056, while in white households it is $37,083.  In the City of Sparta, the median income of Black households is $19,743, while in white households it is $38,523.  U.S. Census Bureau, 2009-2013 American Community Survey 5-Year Estimates, Table B19013.

27. The 2013 ACS also indicates that 33.6 percent of Black residents of Hancock County live in poverty, while the poverty rate is 21.9 percent among white residents.  In Sparta, the Black poverty rate is 28.7 percent and the white poverty rate is 15.3 percent.  U.S. Census Bureau, 2009-2013 American Community Survey 5-Year Estimates, Table B17001.

28. Similarly, 37.0 percent of Black households and 2.7 percent of white households in Sparta received food stamps or SNAP benefits in the past 12 months.  At the county level, the rate is 26.4 percent of Black households and 5.9 percent of white households.  U.S. Census Bureau, 2009-2013 American Community Survey 5-Year Estimates, Table B22005.

29. Racial disparities also exist in education levels.  For example, 2013 ACS indicates that 28.6 percent of Black residents and 11.1 percent of white residents in Hancock County did not graduate from high school.  By contrast, 5.8 percent of Black residents and 21.0 percent of white residents in Hancock County graduated from college.  In Sparta, 38.9 percent of Black residents did not graduate from high school and 5.3 percent graduated from college, while 12.9 percent of white residents did not graduate high school and 15.6 percent graduated from college.  U.S. Census Bureau, 2009-2013 American Community Survey 5-Year Estimates, Table B25003.

30. ACS data indicates there is a racial disparity in home ownership rates.  That rate is 69.4 percent in Hancock County and 58.0 percent in Sparta among Black households.  In white

households, that rate is 94.8 percent at the county level and 85.0 percent at the city level.  U.S.

Census Bureau, 2009-2013 American Community Survey 5-Year Estimates, Table B25003.

31. Data maintained by the Georgia Secretary of State's office demonstrates that white voter

participation in competitive statewide, county, and municipal contests in Hancock County

exceeds Black voter participation.  For example, the white turnout rate was 3.6 (2009), 12.6

(2005), 11.3 (2003), and 9.9 (2001) percentage points greater than the Black turnout rate in the

four Sparta municipal elections since 2000 for which the Secretary of State's office made data

available.  In those elections, Black turnout was 31.4, 38.7, 50.5, and 43.6 percent, respectively,

as compared to white turnout rates of 35.0, 51.3, 61.8, and 53.5 percent.

32. Disparities in socioeconomic status and voter participation are the direct result of the

unfortunate history of pervasive racial discrimination in Hancock County.

33. The county was fully segregated until the early 1970s in various political, social,

religious, commercial, and cultural aspects of its society.  "Hancock County… was unique in the

state, and probably the nation, due to the intensity of its racial polarization in the early 1970s.

Blacks outnumbered whites four to one… However, whites received most of the benefits

provided by local government in the impoverished county, which had never recovered from a

1920 boll-weevil infestation… Total segregation was the rule.  Blacks were barred from

courthouse restrooms."   DONALD L. GRANT, THE WAY IT WAS IN THE SOUTH: THE BLACK

EXPERIENCE IN GEORGIA 434-35 (1993).  Once the Black majority took power at the county level,

the white Sparta mayor used city money to buy ten submachine guns and armed his followers

resulting in "both blacks and whites prepar[ing] for armed warfare."  *Id*. at 435.

34. Hancock County was one of 81 Georgia counties required to desegregate as part of a

1969 school segregation case brought by the U.S. Department of Justice.  *See United States v.*

*Georgia*, C.A. No. 12972 (N.D. Ga. 1969); *United States v. Georgia*, 466 F.2d 197 (1972);

"Desegregation of Public School Districts in Georgia", Georgia Advisory Committee to the

United States Commission on Civil Rights 21 (2007).  By 1974, public schools were 99 percent

Black and the John Hancock Academy, a private school, was 100 percent white.  GRANT, *supra*,

at 435.  Inequities in education still exist in Hancock County.  The county does not receive

funding from the state educational equalization fund, despite the relative poverty of its residents.

*See* Badertscher & Salzer*, supra*.

35. Racial tensions flared again in 2009 when the county commission and board of education

raised property taxes, partly to assist the school system in shedding a $1.7 million deficit.  A

group of predominantly white property owners, many of whom owned weekend homes on Lake

Sinclair, wanted the county to roll back the millage and organized protests.  Jim Tharpe, Anger

Surges With Hancock Taxes, The ATLANTA JOURNAL-CONSTITUTION, Nov. 15, 2009, 2009

WLNR 22968236 (noting that most of the land in the county is owned by whites even though the

vast majority of the county's population is Black).

36. In 1992, the United States Department of Justice denied preclearance under Section 5 of

the Voting Rights Act to the adoption of numbered positions for the Sparta city council.  The

Justice Department's objection letter noted that voting appeared to be racially polarized in Sparta

and the city "advanced no valid, nonracial reason to justify the change," which was adopted

"without any input from the minority community."  Letter from John R. Dunne, Assistant

Attorney Gen., Dep't of Justice, to Debbie K. Mosely, Sparta City Administrator (Feb. 4, 1992),

*available at* http://www.justice.gov/crt/voting-determination-letters-georgia.

### The Sparta municipal election

37. The challenge and removal proceedings alleged herein began in advance of the City of Sparta's municipal election, which is scheduled for November 3, 2015.

38. Sparta is governed by Mayor William Evans and four council members, who are elected at large to four year staggered terms.  Municipal elections are nonpartisan, and council seats are not allocated by place.  The current council members are Faye Ross Sherrod, Roy Hill, and Betty Hill.  The sitting mayor and each of the current council members are Black.  The fourth council seat is currently vacant.

39. The November 3, 2015, municipal election in Sparta is hotly contested and divided along racial lines.  R. Allen Haywood is running against Mayor Evans.  As for the city council, Betty Hill and Faye Sherrod have three opponents: Sarah Patillo, Tom Roberts, and William Case. Each of the challengers is white.

40. In the separate special election for the vacant council seat, Paul McGhee is running against Meredith Ransom.  Both candidates are Black.  Meredith Ransom is the husband of BOER Chair, Kathy Ransom, who is white.  Despite her husband's candidacy for the Sparta City Council seat, Ms. Ransom has not recused herself from voting upon challenges to the eligibility of Sparta voters in advance of the November 3, 2015 election.

41. Several elections-related controversies have polarized the county along racial lines.  They include the challenge and removal procedures at issue in this suit, along with: (a) a proposal by the BOER to eliminate all but one of the voting precincts in Hancock County; (b) the firing of two longtime Black county elections officials; and (c) other alleged improprieties by candidates and Vice Chair Stephens during early voting.

a.   The BOER considered a plan to reduce the number of voting precincts and polling places that would have had a disproportionately negative impact on minority and economically disadvantaged county residents.  Initially, the BOER considered eliminating all but one of the county's ten polling places. The Georgia NAACP, GCPA, and minority citizens opposed any changes to the current alignment.  At a hearing held on August 20, 2015, the BOER tabled Vice Chair Stephens' motion to reduce the number of polling places from ten to five.  The county later agreed on a compromise plan that eliminated one predominantly-minority precinct and its polling place.

b.   The BOER fired Elections Supervisor Aretha Hill and Deputy Registrar Robin Rhodes in April 2015.  There was no public explanation for the firings, and Chairperson Ransom admitted making a "mistake" in moving too quickly to hire new employees.  Eric Mock, *Hancock County Board of Elections Replaces Fired Employees*, WGXA-TV, *available at* http://www.wgxa.tv/news/local/Hancock-County-Board-of-Elections-Replaces-Fired-Employees--310151781.html.  BOER member Robert Ingram, who is Black, stated in a public hearing that "there's something lurking there that does not smell right," and the firings spurred protests outside the temporary Sparta courthouse.  *Id*.; Sitarah Coote, *Hancock employees allegedly fired unfairly*, WMAZ-TV, *available at* http://www.13wmaz.com/story/news/2015/05/05/hancock-employees--allegedly-fired-unfairly/26945033/.  The BOER hired Tiffany Medlock as the Elections Supervisor and Ryan Barr as the Deputy Registrar.  Former supervisor Hill is now the Sparta Elections Supervisor.

c.   Plaintiffs are informed and believe and thereon allege that during the early voting period for the November 3, 2015, Sparta municipal election, BOER Vice Chair Stephens, who is not a certified poll watcher, repeatedly demanded that she be given access to the area

12

inside of the guardrail at the Sparta polling place to monitor the election, even though she had not complied with the requirements of O.C.G.A. § 21-2-408 in advance of the election. Plaintiffs are further informed and believe that Vice Chair Stephens continued to demand access to this non-public area of the polling place and became disruptive while voting was in progress until one or more election officials were forced to take action to remove her from the polling place.

### Timeline of voter challenges and hearings

42. The BOER's illegal conduct occurred recently and in a relatively compact time period.  It has also not fully complied with pre-litigation Open Records Requests.  As a result, the total scope of the challenge and removal procedures and their effect on the voter rolls is not yet clear. The BOER has considered challenges and challenge-related matters in at least 12 meetings over the past three months.  The last known hearings occurred on October 26, 2015.

### July 2015 – August 2015

43. Plaintiffs are informed and believe and thereon allege that Vice Chair Stephens and other members of the BOER discussed the challenging and removal of Sparta voters from the rolls in approximately July 2015.

44. In approximately August 2015, the BOER and its members began initiating challenges to the eligibility of registered voters residing in the City of Sparta.

45. Challenges have been initiated by the Board of Elections and Registration as an entity, Vice Chair Nancy Stephens individually, and county voters Don Bevill and Larry Webb.

46. It is clear from records produced by the BOER pursuant to Open Records Act requests that, between late August and early September, the BOER directed Supervisor Medlock to

review the records of Sparta voters to identify individuals whose driver's license record had a different address than the voter file for the purpose of challenging their eligibility to vote.

47. For instance, an email from Chairperson Kathy Ransom provides that, on August 21, 2015, a BOER member "compared list of challenges with list Elections Supervisor provided to Board that had been worked by the office."

48. Despite being on notice that the data in the DDS system was not necessarily reliable, and without evidence showing any intent of the voters to permanently move their voting domicile outside of Hancock County, the BOER nevertheless moved forward with its plan to challenge and purge voters whose Enet and DDS addresses were not the same.

49. At the August 20, 2015 BOER meeting, Vice Chair, Nancy Stephens, presented a list of Black electors she was personally challenging to Tiffany Medlock, Supervisor of Elections.

50. On or about August 24, 2015, Vice Chair Stephens also presented a list of challenges to the BOER office in an email.  Chairperson Kathy Ransom acknowledged receipt of the challenges in an email to Ms. Stephens dated August 27, 2015.

51. On or about August 25, Vice Chair Stephens sent an email to Supervisor Medlock.  Vice Chair Stephens said that "I know you said you had run [two voters'] thru the DMV (?) information and their driver's licenses showed they lived in Baldwin County.  Have you run the other electors that were challenged thru the same?"  She then asked Supervisor Medlock to either present voters' driver's license information at the August 28 challenge hearing or give it to her beforehand.

52. At a special meeting on August 28, 2015, the BOER considered whether there was "probable cause" for challenges made by Vice Chair Stephens.

53. At this hearing, Vice Chair Stephens challenged approximately 16 voters, contending that they did not live at the Sparta address listed on their voter file.

54. Despite having personally brought the challenges, Vice Chair Stephens made motions or seconded motions in favor of finding probable cause on her challenges.  She then voted in favor of finding probable cause on all of her challenges.

55. A majority of members found "probable cause" to move forward with five of the challenges.

56. Vice Chair Stephens also made a motion to hold a follow-up challenge hearing to consider cancelling the registration of voters for which the BOER had voted in favor of finding probable cause.

57. Secretary Jim Youmans seconded the motion and a majority of the BOER voted to hear Ms. Stephens' challenges at a meeting scheduled for September 17, 2015.

58. Plaintiffs are informed and believe that concerns had been raised by BOER members about the propriety of Ms. Stephens bringing challenges and then voting upon them as a member of the BOER.

59. Thereafter, a white resident of Hancock County named Don Bevill, who is not a BOER member or county elections official, challenged voters.

60. On or before August 29, 2015, and in cooperation with the BOER, Mr. Bevill sent written challenges against Black registered voters listed as having Sparta addresses to Chairperson Ransom and Supervisor Medlock.

61. Virtually all of the Bevill challenges employed a single template that closely resembled the one used by Vice Chair Stephens in filing her challenges.

62. Plaintiffs are informed and thereon allege that on or about August 31, 2015, the BOER held a special meeting where they discussed challenges to electors by Don Bevill.

63. The BOER has not produced any records concerning the August 31 proceedings in response to Open Records Requests, so it is not entirely clear what happened during these proceedings at this time.  Available evidence indicates that BOER members discussed Mr. Bevill's challenges and scheduled "probable cause" hearings for the purpose of considering them on September 10, 2015.

64. The boilerplate language used by Mr. Bevill in his challenges provided: "[a]ccording to reliable witnesses, neighbors and long term associates, the following listed elector is reported not to be living at the address presently shown on the City of Sparta voting list…"  In most instances, the written challenges failed to establish that the voter was not eligible to vote in Sparta or in Hancock County.

**Early September 2015**

65. On September 3, 2015, Mr. Bevill emailed a letter to Chairperson Ransom and Supervisor Medlock.  Mr. Bevill said that the BOER's failure to remove voters in the past brought Sparta "to a crises [sic] point just before an election.  Some will say go ahead and do the election the same way we have been doing them for decades.  I promised some candidates and other citizens that I would do everything in my legal power to prevent another flawed and dishonest election… All of us should do everything we can to make certain that every voter has a legal voting residence in Sparta."

66. By approximately September 9, 2015, plaintiffs are informed and thereon allege that Mr. Bevill lodged approximately 119 challenges against Sparta registered voters.

67. Probable cause and challenge hearings were subsequently held by the BOER on September 10, September 17, September 24, September 28, October 1, October 5, October 8, October 19, and October 26, 2015.

**BOER hearing on September 10, 2015**

68. The BOER held the first hearing for the purpose of determining whether there was probable cause to proceed with Mr. Bevill's challenges on September 10, 2015.  He presented challenges to the eligibility of twelve voters at that hearing.

69. The BOER voted that there was sufficient probable cause for two of those challenges, and that there was no probable cause for three of them.  Mr. Bevill withdrew six challenges, and one was postponed.  A detailed description of the September 10 hearing follows.

70. In his first challenge, Mr. Bevill contested the qualifications of Diana W. Wilson, Shani M. Wilson and James G. Wilson.  Mr. Bevill's challenge was based upon his claim that these electors were "not living at the address presently shown on the City of Sparta voting list [i.e., 312 Adams St. Sparta, GA 31087]" according to "reliable witnesses, neighbors and long term associates."  His written challenge stated that "the current address of these electors is not presently known.  If they are living elsewhere in Sparta, their voting address should be corrected so they can continue voting in Sparta."

71. Despite having the burden of proof on his challenges, Mr. Bevill offered no evidence showing that any member of the Wilson family was not eligible to vote in Sparta elections or should be removed from the Hancock County voter registration rolls.

72. One of the challenged electors, James Wilson, was present at the BOER's meeting.

73. He was sworn in and testified that there was no factual basis for Mr. Bevill's challenge.

17

74. Mr. Bevill could not explain how he came to the conclusion that these electors were not qualified to vote.

75. The BOER found that Mr. Bevill had no probable cause for this challenge.

76. Mr. Bevill's next challenge at the September 10, 2015 hearing was to the eligibility of Lula Mae Stembridge, Priscilla Stembridge and Robert Stembridge.

77. The challenge was again based upon information he claimed to have received from "reliable witnesses, neighbors and long term associates" that these electors were not residing at 697 Adams Street, Sparta, Georgia.

78. Mr. Bevill admitted in his written challenge that he had no information about the current address of the electors. He argued, instead, that if they were living elsewhere in Sparta, their voting address should be corrected so that they can continue to vote in Sparta.

79. BOER member Robert Ingram testified that there was no factual basis for Mr. Bevill's challenge to the qualifications of Lula Mae and Robert Stembridge.

80. Mr. Bevill withdrew his challenge to Lula Mae and Robert Stembridge, but moved forward on the challenge to Priscilla Stembridge.

81. Although Mr. Bevill had the burden of proof and presented no evidence showing that Priscilla Stembridge was not eligible to vote in Sparta or Hancock County, Vice Chair, Nancy Stephens, made a motion that there was probable cause to proceed. Her motion was seconded by Jim Youmans. The motion carried when Chairperson Ransom voted in favor of the motion. Both Black BOER members voted against finding probable cause.

82. The third challenge presented at the September 10, 2015 hearing by Mr. Bevill was to the eligibility of Angela L. Tucker to remain on the Hancock County list of eligible electors. Mr. Bevill stated in his written challenge that it was based upon information from "reliable witnesses,

neighbors and long term associates," that Angela L. Tucker was residing at an address located within Hancock County, but outside of the Sparta city limits.

83. Angela M. Tucker was present in the audience at the hearing and stated that she lived at the address in question.  She disputed that Angela L. Tucker was residing at her address.

84. Mr. Bevill withdrew the challenge to Angela L. Tucker's eligibility to vote, noting that "obviously there may be a mistake in names."  He gave no explanation for how he made the mistake.

85. Mr. Bevill proceeded to withdraw four more of his challenges at the September 10, 2015, hearing.  He asked to postpone another challenge, admitting that the challenged elector "may live in Sparta."

86. The BOER voted to find probable cause on only one more of Mr. Bevill's challenges at the September 10 hearing.  This was a challenge made to the eligibility of Shanee Shandrina Lewis to remain on the Hancock County elector's list.

87. Mr. Bevill based his written challenge upon information he claimed to have received from "reliable witnesses, neighbors and long term associates," which indicated Ms. Lewis was "not presently living at the address presently shown on the City of Sparta voting list [i.e., 42 Bell Street].

88. The challenge went on to state that "[t]he residence address of this person is not presently known.  If she is living elsewhere in Sparta, her voting address should be corrected so she can continue voting in Sparta."

89. Although the written challenge included no evidence indicating Ms. Lewis was not qualified to vote in Sparta or Hancock County, Vice Chair Stephens moved to find probable cause for the challenge. The motion was seconded by Secretary Youmans.  The motion passed

when Chairperson Ransom voted in favor of finding probable cause.  Both Black BOER members voted against finding probable cause.

90. Following Mr. Bevill's poor showing on his challenges, the BOER adopted a motion directing him to meet with the Elections Supervisor the next day to review his list of voters with her for the purpose of determining the ones that he believed he could establish probable cause.

### Remainder of September 2015

91. Plaintiffs are also informed and believe and thereon allege that certain BOER members arranged for the Supervisor of Elections, Ms. Medlock, to assist Mr. Bevill with developing future challenges even though Mr. Bevill bore the burden of proof under Georgia law.

92. Plaintiffs are also informed and believe and thereon allege that the BOER, as a matter of "courtesy," arranged for the Hancock County Sheriff's Office to serve each voter challenged by Mr. Bevill with a summons commanding their appearance at his or her scheduled hearing.  There was no cost to Mr. Bevill for this service.

93. Thereafter, on September 14, Supervisor Medlock sent an email to Mr. Bevill with an "amended list" of 49 voters he wished to challenge at that time, based on the outcome of their prior collaboration.

94. Mr. Bevill responded on September 15, asking that she take two voters off and add fifteen voters to her list.  He also asked to meet with her within the next day or two to "reconcile as much as we can so we can shorten time before the board."

95. On September 16, Supervisor Medlock asked Mr. Bevill by email to "stop by the office at any time today or tomorrow."  She related that she had compared the addresses for each voter challenged by Mr. Bevill in the DDS database and Enet, the statewide voter registration database.  Further, "[t]he only electors I will proceed with [to challenge] are the ones I have been

able to identify as potentially having a different address through DDS and other sources.  The burden of proof rest on me once I present the information to the board…"  She added that "DDS is not the most reliable source due to several reasons," so she did not rely on information that "is from several years ago [when] we have made contact with the elector since then."  Finally, she added that she was still "checking to see what may have happened with [the] status" of two voters Mr. Bevill wished to challenge.

96. On September 17, 2015, the BOER considered the challenges filed by Vice Chair Stephens on which it had previously determined there was "probable cause" to proceed.  One of the voters challenged by Ms. Stephens was removed from the registration list at the hearing.

97. Ms. Stephens made the motion to remove the elector pursuant to her challenge and Jim Youmans seconded the motion.  The motion carried when Chairperson Ransom voted in favor of the removal.  Robert Ingram voted against removing the elector and Linda Clayton abstained.

98. Two of Vice Chair Stephens' challenges, including the one to the eligibility of Plaintiff Johnny Thornton, were tabled to the next meeting.

99. On September 18, 2015 Chairperson Ransom sent an email to the BOER and county election officials identifying a "tentative projected schedule for challenges" of four meetings between September 24 and October 1.  She suggested that the BOER hold a meeting on September 28 to consider "BOER Challenges* to include two tabled Challenges by Nancy Stephens."  Similarly, she slated "BOER Challenges*" for October 1.  She later defined the asterisk: "*Elections Supervisor Medlock has identified 30 Electors that should be addressed by the BOER…"

100.      Supervisor Medlock told local media on September 24 that the voter challenges could change the outcome of the Sparta municipal election.  She noted that the challenges would

"probably affect the city of Sparta's election in a major way."  Eric Mock, "Hancock County electors being challenged," *WXGA-TV*, Sep. 24, 2015, available at http://www.wgxa.tv/news/local/Hancock-Couty-electors-being-challenged-329246811.html.

101.     At the September 28, 2015, hearing, the BOER voted on numerous BOER and Stephens challenges.  It sustained challenges to approximately 15 voters and removed them from the registration list.

102.     Plaintiff Larry Webb presented fourteen voter challenges on September 18, 2015, in an attempt to expose the sham and discriminatory nature of the challenge proceedings by the BOER and Mr. Bevill.  Mr. Webb is a veteran who served in Iraq.  A regular attendee of BOER meetings, he came to the opinion that the challenge procedures were being implemented in a discriminatory manner.  He obtained a copy of the county's voter registration list from November 2014 and used it as the basis for his challenges.  Most of the challenges made by Mr. Webb were against non-Black voters.

103.     Chairperson Ransom and Supervisor Medlock refused to accept his challenges because they were all listed on one page, even though Georgia law does not mandate that challenges be filed on separate pieces of paper.  They told Mr. Webb that they could not proceed unless he listed each challenge on a single sheet.

104.     Later that morning, Supervisor Medlock forwarded Mr. Webb's challenges to members of the BOER.  Mr. Webb's challenges were viewed with obvious disdain by certain members of the BOER.  That afternoon, Vice Chair Stephens emailed her a response beginning "[i]sn't this one going to be fun."  Vice Chair Stephens then gave unsolicited information indicating that certain voters challenged by Mr. Webb currently live in Sparta or can legitimately claim residency there.

**October 2015**

105.     At the October 1st hearing, the BOER voted on BOER challenges.  It voted to sustain challenges to the eligibility of about 9 voters, who are ineligible to vote in the Sparta municipal election.

106.     Troy Harden, one of the electors challenged based upon the alleged discrepancy between the Enet and DDS addresses, appeared at the hearing and asserted he was eligible to vote.  It was determined during the hearing that the DDS record used by the BOER in support of the challenge was for an entirely different voter.  Nevertheless, Mr. Harden was forced to attend this hearing to prevent the BOER from unlawfully removing him from the voter rolls.

107.     At the October 5th hearing, the BOER voted to remove approximately 15 voters challenged by Mr. Bevill from the registration list.  Since October 5 was the close of registration for the Sparta municipal election, these voters were the last to be removed from the registration list and therefore be completely ineligible to vote.

108.     On October 8, 2015, the BOER held "probable cause" hearings on 17 more electors challenged brought by Mr. Bevill.

109.     Mr. Bevill's challenges followed the same general format of his earlier challenges and, in most instances, failed to even allege that the voters had a domicile outside of Hancock County that would have rendered them ineligible to vote in the county.

110.     Nevertheless, the BOER found "probable cause" to move forward on 16 of the 17 challenges.

111.     Mr. Webb also re-submitted his challenges on October 8.

112.     The BOER did not give him access to Enet, the DDS database, or assistance from Supervisor Medlock.

113.     Contrary to its earlier practice of cooperating with and assisting Mr. Bevill with his challenges, the BOER worked separately with Supervisor Medlock to throw up road blocks to Mr. Webb's challenges.  On October 12, Chairperson Ransom emailed Supervisor Medlock regarding Mr. Webb's and stated "[w]hat fun are you having today! :)".  Chairperson Ransom instructed Supervisor Medlock to "schedule Mr. Webb's challenges – **make him do this!**" (her emphasis).

114.     After proceeding to give Supervisor Medlock assistance regarding several voters challenged by Mr. Webb, Chairperson Ransom said "[j]ust a guess…he's targeting folks that are 'white' :)".

115.     Vice Chair Stephens and Chairperson Ransom sent Supervisor Medlock emails on October 12 and 14, respectively.  The emails repeatedly defended challenged white voters.  They indicated that certain voters challenged by Mr. Webb were Sparta residents, while other individuals were deceased and therefore ineligible to be challenged.

116.     Vice Chair Stephens and Chairperson Ransom acknowledge in the three emails that some of the voters challenged by Mr. Webb do not reside in Hancock County or are deceased.

117.     On October 16, Supervisor Medlock sent a letter to Sparta Elections Supervisor Aretha Hill listing twelve voters whose eligibility has been challenged.  The letter instructs Hill to "direct them to the Board of Elections and Registration office for further information" if they attempt to vote in the Sparta election.  These voters had been challenged by Mr. Bevill.

118.     Later that day, Supervisor Medlock sent Mr. Bevill an email informing him of the letter she sent to Supervisor Hill.  She mentioned that twelve voters were placed in "challenged" status "[d]ue to probable cause being found" at the October 8 hearing.  If a challenged voter

"appears at the polling place to vote, the elector may visit the BOER office to address the challenge status."  No final determination was made by the BOER regarding the twelve challenges.

119.      On October 19, a probable cause hearing was held regarding the Webb challenges.  Four of the voters challenged by Mr. Webb had allegedly been removed from the rolls by the BOER prior to the hearing because they were deceased and therefore were ineligible to be challenged by Mr. Webb.   The BOER dispensed with most of the remaining challenges except for three by determining that they were eligible to vote in Hancock County.  The board found probable cause to proceed with challenges to the eligibility of three voters, all of whom are Asian-American.  One of the three had been challenged by Mr. Bevill at the hearing on September 10.

120.      Mr. Bevill sent an email to Supervisor Medlock on October 20 instructing her to remove four Black voters "from the City of Sparta voting list because their residence addresses are outside the limits of Sparta."  He added that "[c]hallenges will be issued against the already requested absentee ballot votes" of three of those voters.

121.      On October 26, the BOER held two challenge hearings.  These were the last known challenge hearings before the filing of this action.  The BOER heard Mr. Bevill's challenges in the morning, and Mr. Webb's challenges at 5 pm.

122.      In the morning hearing, the BOER voted to remove nine voters from the registration list.  All nine voters were among those referenced in Supervisor Medlock's October 16 letter.

123.      Near the beginning of the October 26, 2015 hearing on Mr. Bevill's challenges, Chairperson Ransom informed Mr. Bevill that while the BOER had previously made

arrangements with the Hancock County Sheriff to attempt personal service of summonses on the voters he challenged voters as a "courtesy" to him at no charge, it would no longer do so because the Sheriff's office said it would begin charging $50 per summons going forward.

124.     During the October 26, 2015 hearing, Mr. Bevill informed the BOER that Sarah Patillo, a white candidate running for a Sparta City Council seat in the November 3, 2015 election, provided Mr. Bevill with the names of voters to challenge, including Moriah Janea Speights, Jarlessia Monique Heath, and Daphne Monice Health.

125.     Candidate Patillo was present at the hearing and testified as a witness on behalf of Mr. Bevill. Although Ms. Patillo said the voters had moved from the home listed on their voter registration, Candidate Patillo's testimony did not establish that any of the electors were not qualified to vote in Sparta or in Hancock County.

126.     In addition, Supervisor Medlock testified that she sent letters to the three voters, none of which had been returned to her office.

127.     Nevertheless, a majority of the BOER voted to remove these three electors from the Hancock County registration rolls.  BOER Member Ingram voted against removing these electors from the rolls.

128.     The BOER also considered Mr. Bevill's challenge of Arveshawn Quintina Walker at the October 26, 2015 hearing.  Mr. Bevill stated that he believed Ms. Walker was no longer residing at the address on her voter registration records, but that she was still residing within Hancock County.

129.     Ms. Medlock testified that Ms. Walker was already on inactive status, but that she had personal contact with her twice before the hearing and that she was still living in the County, although not in the City of Sparta.

130.     Ms. Medlock testified that as a result of the finding of "probable cause" on Mr. Bevill's challenge, Ms. Walker would remain in challenge status at the time of the election. Despite the fact there was no evidence showing Ms. Walker was not eligible to vote in the County and had already be placed into inactive status, the BOER voted to give Ms. Walker until November 6, 2015, to update her address with the BOER and, if she did not, she would be removed from the Hancock County elector's list.

131.     The BOER also considered a challenge by Mr. Bevill to the eligibility of Sherrodd Williams to vote in Hancock County.  Despite the fact that BOER Member Ingram believed Mr. Williams lived on the Eatonton Highway within Hancock County, the BOER voted to give Mr. Williams until November 6, 2015, to update his address with the BOER and, if he did not do so, he would be removed from the Hancock County elector's list.

132.     The BOER also considered a challenge filed by Mr. Bevill to the eligibility of Emma and Jimmy Johnson, husband and wife, to remain on the Hancock County voter rolls during the October 26, 2015 hearing.

133.     Candidate Patillo was called to testify by Mr. Bevill.  Ms. Patillo testified that she purchased the home where the Johnson's had resided and they were no longer living there. Candidate Patillo did not testify that the Johnson's were residing outside of the County and did not know where they were residing.

134.     Supervisor Medlock testified that she sent notice of the hearing to the Johnson's by mail that could not be forwarded.  When the letter was returned to the BOER office, it bore a forwarding address to a Sparta Post Office Box.  Since Ms. Medlock claimed she received the letter shortly before the hearing she had not attempted to reach the voters through the Post Office Box address.

135.     Nevertheless, Nancy Stephens moved to remove both of the Johnson's from the voter rolls.  When her motion failed to carry, a majority of the BOER voted to have Supervisor Medlock send the voters a letter at the Post Office Box and that if they did not respond to update their registration by November 6, 2015, they would be removed from the list of eligible voters.

136.     Other voters were removed from the voter registration rolls on October 26, 2015 as a result of Mr. Bevill's challenges based upon hearsay, speculation and without written confirmation from the voters that they no longer intended to maintain their voting domiciles in Hancock County.

137.     Ms. Medlock confirmed during this hearing that she reviewed the Driver's Services Records of all the voters challenged by Mr. Bevill and would only mention this evidence in her testimony if there was a discrepancy between the voter's Enet record and driver's license record.

138.     During the October 26, 2015 hearing, Supervisor Medlock stated that some, but not all, challenged voters would be given provisional ballots.  She added that the provisional ballots would not count unless the voters provided proof of their residency at the BOER office before the end of the three day provisional ballot review period following the election.

139.     At the October 26 afternoon hearing, the BOER considered two challenges made by Mr. Webb.  The BOER voted to sustain a challenge against the eligibility of one Asian-American voter, and voted to add a second Asian-American voter to the inactive list.  The latter voter was the one who had been challenged by Mr. Webb at the September 10 hearing.  This appeared to mark the first time in the twelve challenge hearings that the BOER voted to change a voter's status in the registration database from active to inactive.

140.     On October 28, Supervisor Medlock sent a letter to Supervisor Hill listing the nine voters who had been removed at the October 26 hearing.  The letter stated that the nine individuals "are not eligible to vote in the City of Sparta election."  Supervisor Medlock's letter also listed 11 new individuals whose eligibility had been challenged, and instructed Hill to direct them to the BOER office if they attempted to vote in the Sparta election.

141.     On November 2, Plaintiffs are informed and believe and thereon allege that city council candidates, Meredith Ransom, the husband of BOER Chair, Kathy Ransom, and Tom Roberts, filed challenges to thirteen absentee ballots based upon allegations that there "is not sufficient information available at the local authority to verify the validity of the voter." Candidates Ransom and Roberts requested that these "absentee ballot[s] be discarded" and the votes not be counted. It is unclear why the candidates singled out these 13 absentee ballots for a challenge or why the Supervisor of Elections would have issued absentee ballots if there was insufficient information to "verify the validity" of the voters. Plaintiffs are further informed and believe that Candidate Ransom also challenged at least one absentee ballot, claiming that the voter was not on the most recent voter list.

**Georgia residency and voter challenge procedures**

142.     The challenge-related activities undertaken by the BOER and Elections Supervisor do not serve any legitimate government interest because, in addition to violating federal law, its members have failed to consistently apply Georgia state law.  Among other shortcomings, the BOER misapplied Georgia residency laws by failing to consider whether voters moved temporarily, ignored state law permitting voters who have moved within the county to vote, and shifted the burden of proof from the challenging individual to the voter whose eligibility is being challenged.

143.     In Georgia, the fact that a voter is not presently living or residing at the address listed in Enet does not disqualify her from voting in the jurisdiction.  *See generally Cook v. Bd. of Registrars of Randolph Cty.*, 320 Ga. App. 447 (2013).  State law provides that a person may maintain her residence at her home if she "leaves [her] home and goes into another state or county or municipality in this state, for temporary purposes only, with the intention of returning…"  O.C.G.A. § 21-2-217(a)(2);

144.     Georgia law explicitly permits voters to maintain their prior address for voting purposes in the event of a move made under the following circumstances: (1) moving to "any county or municipality" in Georgia "for temporary purposes [] without the intention of making such county or municipality such persons permanent place of abode"; (2) enrolling "at any college, university, or other institution of learning" in Georgia; (3) serving in the United States armed forces; (4) moving "to engage in government service"; (5) being "committed to an institution for the mentally ill."  O.C.G.A. §§ 21-2-217(a)(3), (8), (10-12).

145.     The Georgia Code further clarifies that "[t]he mere intention to acquire a new residence, without the fact of removal, shall avail nothing; neither shall the fact of removal without the intention."  O.C.G.A. § 21-2-217(a)(9).  In this vein, a voter's voting residence "shall not be required to be the same as the residence for voting purposes of his or her spouse."  O.C.G.A. § 21-2-217(a)(7).

146.     Voters who have moved within the same county can legally vote, even if their new residence lies within a different voting precinct and they have not updated their registration information.  They "shall vote in the precinct of such elector's former residence" so long as they fill out a "form[] furnished by the Secretary of State… reflect[ing] such elector's present legal address."  The BOER will then change the voter's address in Enet and she will have to vote in

the new precinct in subsequent elections.  O.C.G.A. § 21-2-218(d).  The voter can also submit a valid absentee ballot application if they "move to an address within the county or municipality which is different from the address contained on the person's registration card."  O.C.G.A. § 21-2-218(c).

147.    A voter is also not precluded from voting if her registration record indicates a change of address.  The Georgia Code provides that "[i]n the event that the registration records incorrectly indicate that an elector has moved from an address within a precinct, the elector may vote in the precinct upon affirming in writing on a form prescribed by the Secretary of State that the elector still resides in the precinct at the [same] address."  O.C.G.A. § 21-2-218(g).

148.    The BOER is empowered under state law to "examin[e] from time to time the qualifications of each elector of the county or municipality" and "[i]f, after conducting a hearing, the [BOER] find[s] that the elector is not qualified to remain on the list of electors… remove the name of such elector from the list of electors."  O.C.G.A. § 21-2-228.  If a voter is removed following the close of registration for a particular election, she may cast a challenged ballot that will count if they provide proof of residence to the BOER.  *See* O.C.G.A. § 21-2-230(i).

149.    A voter's qualifications can also be challenged by "[a]ny elector of a county," in which case the BOER must set a hearing to hear the challenge.  O.C.G.A. §§ 21-2-22(a) and (b).  At these hearings, "[t]he burden shall be on the elector making the challenge to prove that the person being challenged is not qualified to remain on the list of electors."  O.C.G.A. § 21-2-229(c).  The BOER then must determine the merits of the challenge to the voter's eligibility.  O.C.G.A. § 21-2-229(d).

### Experiences of challenged voters

150.     Plaintiffs Merritt and Taurus Hubert have lived at the same residence at 174 Front Street in Sparta for years.  They sometimes stay temporarily at their disabled mother's house, also located in Sparta, to assist her and provide medical care.

151.     Don Bevill filed a challenge alleging that he could not identify them as residents of 174 Front Street.  At a hearing held on September 24, 2015, the BOER found there was probable cause that Plaintiff Taurus Hubert did not live at 174 Front Street.  The BOER then issued an agenda identifying both Taurus and Merritt Hubert as voters whose eligibility to vote would be challenged on October 5, 2015.

152.     Merritt Hubert attended the hearing on October 5.  Since his brother, Taurus, had to work, Merritt presented a letter disputing the challenge on his behalf to the BOER.  Merritt Hubert also testified at the hearing.

153.     The BOER ultimately voted against sustaining the challenge to Taurus' eligibility. It never formally ruled on the challenge to Merritt Hubert's eligibility.

154.     Nevertheless, the Huberts remain in danger of being challenged and removed from the list of eligible electors in the future as a result of the BOER's unlawful policies and practices as alleged herein.

155.     Plaintiff Johnny Thornton has owned property in the county for about five years. Mr. Thornton's address at 4210 Jewell Street is reflected on his current driver's license and his personal vehicle is registered at that address.  He receives bills at and pays county property taxes on his property.  Mr. Thornton is the treasurer of the Hancock County NAACP, a member of the City of Sparta Housing Authority, and he sits on the board of a local citizens' group.

156.    Despite these facts, Vice Chair Stephens challenged Mr. Thornton's eligibility to vote in Hancock County.

157.    On July 28, 2015, chairperson Ransom sent an email to Supervisor Medlock describing her conversation with an employee of the Georgia Secretary of State's office, whom she said told her that "there are a number of ways people can declare residency – for instance, Mr. Thornton could use his address, the catfish farm, stating that he's saving money to build a house there etc…and is not registered any where else – he is declaring that to be his home…"

158.    Vice Chair Stephens nevertheless challenged Mr. Thornton's eligibility to vote, contending that he also had property in Warren County.

159.    At a hearing held on August 28, the BOER found there was probable cause that Plaintiff Thornton did not live in Hancock County, even though the Supervisor of Elections confirmed that Mr. Thornton's driver's license bore the 4210 Jewell Street address where he was registered to vote.

160.    After learning that Ms. Stephens was challenging his eligibility to vote in Hancock County, Mr. Thornton communicated to Supervisor Medlock, through his attorney, that he could not attend his challenge hearing.

161.    Despite the fact that the Supervisor of Elections, Ms. Medlock, told the BOER at the BOER meeting on September 28, 2015 that Mr. Thornton's attorney advised her that Mr. Thornton had plans to be out of town until November 18, 2015, the BOER voted to remove Plaintiff Thornton from the registration list.

162.    Plaintiff Martee Flournoy grew up in Sparta and has always been registered to vote there.  Mr. Flournoy temporarily resided in Milledgeville in Baldwin County for a time in approximately 2014 and for part of 2015, but he had no intention of permanently changing his

voting domicile to Milledgeville from Sparta.  In fact, Mr. Flournoy resumed his permanent residency in Sparta in 2015.

163.　　The BOER challenged Plaintiff Flournoy's eligibility to vote because he obtained a driver's license which bore his temporary address, which did not match the address on his Enet record.

164.　　Prior to his hearing on this challenge, Mr. Flournoy provided details of his personal living situation to the Elections Supervisor, and the challenge to his eligibility to vote appears to have been withdrawn.

165.　　However, Mr. Flournoy remains at risk of being challenged and removed from the rolls in the future as a result of the BOER's unlawful policies and practices as alleged herein.

166.　　Cynthia Franklin has been living at the same residence in Sparta for approximately eight years.

167.　　For about the past year and a half, she has been involved in a romantic relationship with a man who lives in Hancock County, but outside of the Sparta city limits. Although Ms. Franklin spends time at his home, she maintains her permanent residence at her home in Sparta and never intended to give up the Sparta location as her voting domicile.

168.　　At a hearing held on September 24, 2015, the BOER found probable cause that Ms. Franklin did not live in Sparta based upon the unfounded claim by an associate of Mr. Bevill that her Sparta home was vacant and she was not living there.  Mr. Bevill did not offer any evidence that Ms. Franklin was not eligible to vote in Hancock County.

169.　　Nevertheless, Ms. Franklin received a letter stating that her eligibility to vote in Hancock County would be challenged on October 5, 2015.

170.     Ms. Franklin arrived late to the hearing on October 5, and the challenge was heard in her absence.

171.     She learned upon arriving that the BOER had already taken up the challenge, but that the BOER would allow her to present evidence.

172.     Ultimately, Ms. Franklin was allowed to remain a registered voter.  To establish her right to remain on the Sparta voter list, however, Ms. Franklin had to provide testimony concerning why she was spending time at her male friend's home that included personal and private information.

173.     Ms. Franklin remains at risk of being challenged and removed from the voter registration rolls as a result of the BOER's unlawful policies and practices as alleged herein.

174.     Plaintiffs are also informed and believe and thereon allege that the BOER removed Sanquan Thomas from the list of eligible electors in Hancock County.  Mr. Bevill alleged that 85 Willis Street in Sparta, the address on Mr. Thomas' voter registration record, was vacant due to the home being destroyed in a fire.

175.     Plaintiffs are informed and believe and thereon allege that Mr. Thomas was removed from the voter registration rolls without any evidence that he was no longer eligible to vote in Sparta or Hancock County.

176.     In fact, Plaintiffs are informed and believe and thereon allege that Mr. Thomas and his family have had to find temporary lodgings.  In or around July 2015, they lost their home and nearly all of their possessions as a result of a fire.

177.     Plaintiffs are further informed and believe that Mr. Thomas and his family have been temporarily residing in or around Hancock County and have a present intent to maintain their domicile for voting purposes in the City of Sparta.

178.     Plaintiffs are informed and believe and thereon allege that it is likely that other eligible electors have been removed from the rolls as a result of the unlawful customs, policies and practices employed by the BOER.

### Description of the challenge process

179.     The BOER conducted the Bevill, Stephens, and Webb challenges in two phases. The first phase is the "probable cause" hearing.  The BOER purports to determine whether it is "more likely than not" that the voter does not currently reside at the address indicated in the voter registration database, notwithstanding the fact that voters may be eligible to vote to vote in Sparta or Hancock County even if they are not presently living there.

180.     If the "more likely than not" threshold is satisfied, the BOER formally challenges the qualification of the voter at a second hearing.

181.     The BOER mailed hearing notices to voters only at the addresses listed in the registration database, and not to addresses provided by Mr. Bevill or listed in the Georgia Department of Driver's Services ("DDS") database.  The notice letters did not identify the voter's challenger or describe any of the alleged facts supporting the challenge.

182.     The notice letters were sent via non-forwardable mail, meaning that they would be returned to the BOER instead of being forwarded to any other address, including those provided by Mr. Bevill or listed in the DDS database.

183.     The notices warned the challenged voters that the "[f]ailure to respond to this summons will result in the deletion of your name from the Hancock County Elector's List."

184.     Supervisor Medlock conducted research to support challenges made by the BOER, Vice Chair Stephens, and Mr. Bevill.  She presented them with information indicating whether challenged voters had a different address on file in Enet than in the DDS database.  As

she acknowledged, information maintained in the databases is sometimes outdated and therefore unreliable.

185.    Mr. Bevill supported his challenges with information from third parties, which frequently consisted of hearsay and mere speculation.   Mr. Bevill stated during one of these hearings that, outside of his collaboration with Supervisor Medlock, he lacked personal knowledge of the facts alleged in his written challenges and that his knowledge was primarily based upon hearsay from other persons.

186.    Mr. Bevill explained that he asked an individual named Harrell Lawson to investigate whether voters were living at the addresses on their voter files.  In many cases, however, Mr. Lawson also admitted lacking personal knowledge of the alleged facts.  In most cases, Mr. Lawson claimed he relied on hearsay reports from third parties, the vast majority of whom were never identified during the challenge hearings.

187.    In many cases, the BOER's probable cause determinations were based upon hearsay and rank speculation supported by little or no verifiable evidence.

188.    Once a hearing was scheduled, the BOER attempted to contact voters challenged by the BOER, Vice Chair Stephens, and Mr. Bevill.  Supervisor Medlock would take one or both of the following actions: (1) mail a notice letter to the voter at the address listed in Enet; or (2) engage local law enforcement to personally serve voters with the summons at that address.  In some cases, the notice letter was returned as undeliverable or officers claimed they were unable to effect service.  If either event occurred, the BOER considered it to be sufficient evidence to support removal.  These facts do not, however, establish that a voter changed his or her voting domicile under Georgia state law.

189.     There is no evidence indicating that the BOER attempted to contact voters challenged by Mr. Webb by U.S. mail or through summons by law enforcement.  This had the effect of hampering Mr. Webb's challenge efforts.  Unlike other challengers, Mr. Webb could not rely on returned non-forwardable mailings or failed attempts at service by law enforcement as evidence that voters no longer resided at the address listed in Enet as Mr. Bevill had.  (See Exhibits 1 and 2 attached and incorporated herein by reference as examples of a summons and notice issued by the BOER on to voters challenged by Mr. Bevill). Emails also indicate that BOER members contacted certain voters challenged by Mr. Webb over the phone and made other individual efforts to try to verify the legitimacy of their Hancock County address.

190.     Mr. Webb's challenges were treated differently than all of the others insofar as (1) he was not provided access to the DDS database; (2) he did not receive assistance from Supervisor Medlock; (3) the BOER undermined his challenges; and (4) his hearsay statements were accorded little, if any, weight in challenge hearings.

191.     The BOER frequently removed voters from the registration list not due to an affirmative determination of ineligibility, but rather because the challenged voters simply did not appear for their hearings or were not present at their home when Mr. Bevill or his associates stopped by.

192.     The result of this process is that the BOER frequently shifted the burden of proof from the challenging voter, as required by O.C.G.A. § 21-2-229(c), to the voter whose eligibility was being challenged.  For example, even if a voter has temporarily moved to a different address, that fact does not establish that the voter intended to move his or her voting domicile to another location outside of the jurisdiction.  Voters may not have been present to receive service

from law enforcement because they were attending college, helping a sick relative, or working, among other reasons.

## Overview of the challenge proceedings

193.     The challenge proceedings have affected a substantial number of voters. Since August 2015, at least 201 registered voters have been challenged based on a change of address. Of those, approximately 174 voters were challenged by the BOER, Vice Chair Stephens, and Mr. Bevill.

194.     Of these 201 challenges, approximately 50 have been sustained as of the date of the filing of this action. All but one of the sustained challenges were made by the BOER, Vice Chair Stephens, and Mr. Bevill.

195.     At least 39 challenges were sustained by the BOER before the voter registration deadline for the November 3, 2015, election. That deadline was October 5. This group of voters has already been removed from the list and are ineligible to vote in the Sparta municipal election and in federal elections in 2016. An additional 11 challenges were sustained on October 26, which was after the close of registration. These voters have been placed into "challenge status," which means they will not be permitted to vote a regular ballot in the Sparta municipal election unless they produce proof of residency to the BOER. They will be ineligible to vote in future elections, including federal elections.

196.     Data from Enet indicates that, as of October 9, 2015, the voter registration status of eight Sparta voters had been changed to "pending" as a result of voter challenges. They will have to provide proof of residency to the BOER before being permitted to vote. All eight voters are Black.

197.     Supervisor Medlock's October 16 and October 28 letters to the Sparta Elections Supervisor indicate that at least 14 other challenged voters must provide proof of residency in Sparta to the BOER before they can vote in the Sparta municipal election.  Supervisor Medlock has imposed this requirement despite the fact that the BOER has made no final determination regarding the challenges to those voters' eligibility.

198.     A significant percentage of Sparta's electorate has been challenged.  According to the 2010 Census, Sparta has a total voting age population of 1,083.  As of October 9, 2015, which is after the close of registration for the November 3 election, the city has 988 registered voters.  A conservative estimate indicates that approximately twenty percent of the city's registered voters have been challenged, and more than five percent have been or will be removed from registration list.

199.     Requiring proof of residency on Election Day is a significant burden for many voters in Sparta.  The polling place for the municipal election is the Sparta City Hall, which is located downtown.  The BOER office is located more than a mile from the city hall.  Voters who are informed at the polling place that they need to go to the BOER office to provide proof of residency would therefore have to travel approximately two and a half miles round trip.  There is no or extremely limited public transportation in the city.  Additionally, the BOER office's standard hours of operation are from 8 am until 5 pm, and there is no indication that they will be extended on Election Day.

200.     Plaintiffs are informed and believe and thereon allege that most of the challenged voters were listed in Enet as having a Sparta address at the time they were challenged.

201.     Upon information and belief, nearly all of the voters challenged by the BOER, Defendant Stephens, and Mr. Bevill are Black.

202.     Upon information and belief, nearly all of the approximately 34 voters challenged by the BOER are Black.

203.     Upon information and belief, nearly all of the approximately 19 voters challenged by Ms. Stephens are Black.

204.     Upon information and belief, nearly all of the approximately 121 voters challenged by Mr. Bevill are Black.

205.     Upon information and belief, most of the 27 voters challenged by Mr. Webb are not Black.

206.     The BOER imposed the challenge and removal procedures disproportionately on minority voters and also conducted the process in an arbitrary and discriminatory manner.  Even if the procedures had been imposed uniformly, they would have negatively affected Black voters more heavily than white voters due to differences in socioeconomic status and civic participation caused by the history of racial discrimination in Hancock County.

207.     Plaintiffs are informed and believe and thereon allege that the BOER acts as a final policy-maker for Hancock County on subjects relating to voter registration, voter eligibility, voter challenges, absentee ballot applications and voting by absentee ballot, and other matters concerning voting and elections in Hancock County

208.     Plaintiffs are further informed and believe and thereon allege that the persistent and widespread unlawful challenging and purging of Black voters by the BOER constitutes a *de facto* Hancock County policy, custom or practice to violate the constitutional rights of eligible Black voters in Hancock County.  This *de facto* policy, custom or practice caused the violation of the Plaintiffs' Constitutional and/or federal statutory rights as alleged herein.

209.     Plaintiffs are further informed and believe and thereon allege that the BOER maintains a custom, policy or practice of failing to provide constitutionally adequate training to the members of the BOER and Supervisor of Elections and that said custom, policy and/or practice of failing to train the members of the BOER and Supervisor of Election caused or contributed to the cause of the Constitutional and/or federal statutory violations as alleged herein.

210.     The challenge and removal procedures violate Section 8(d) of the National Voter Registration Act of 1993.  Plaintiffs' counsel served a notice letter on counsel for the BOER and the Georgia Secretary of State's office on October 26, 2015, pursuant to Section 11 of the NVRA.  A true and accurate copy of said notice letter is attached and incorporated herein by reference as Exhibit 3.  Counsel for Defendants declined to waive the 90 day notice period so that the NVRA claims could be joined in the Complaint at this time.  Therefore, Plaintiffs reserve the right to seek leave to amend the complaint, if necessary, to bring the NVRA claims once the 90 day notice period has expired.

## FIRST CLAIM FOR RELIEF
### (52 U.S.C. § 10301 - Violation of Section 2 of the Voting Rights Act)

211.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 210 above as if set forth fully herein.

212.     Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, protects Plaintiffs from denial or abridgment of the right to vote on account of race, color, or membership in a language minority group.  Section 2 provides, in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United State to vote on account of race or color, or [membership in a language minority group].
> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political

processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

213.     The challenge and removal procedures have imposed a substantial and unwarranted burden on Black voters and denied them equal opportunity to register, remain on the list of eligible electors and to vote in Hancock County elections.

214.     In Hancock County, the following circumstances are present: (1) a history of discrimination related to voting; (2) racially polarized voting patterns; (3) lingering effects of discrimination in such areas as education and employment; (4) a lack of responsiveness to the needs of the minority community by the BOER; and (5) the discriminatory and arbitrary policy underlying the challenge and removal procedures does not serve a legitimate government purpose.

215.     As a result of the challenge and removal procedures, and under the totality of circumstances, the political process in Hancock County is not equally open to participation by Black citizens insofar as they have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

216.      The challenge and removal procedures constitute a qualification or prerequisite to voting within the meaning of Section 2 of the Voting Rights Act, and result in the denial or abridgement of the right to vote of Hancock County residents on account of their race or color in violation of Section 2.

217.     Plaintiffs will continue to suffer the violation of their rights as alleged in the Complaint absent relief granted by the Court.

## SECOND CLAIM FOR RELIEF
### (52 U.S.C. § 10301 and 42 U.S.C. § 1983 - Discriminatory Purpose in Violation of Section 2 of the Voting Rights Act, and the Fourteenth Amendment to the United States Constitution)

218.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 217 above as if set forth fully herein.

219.     42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

220.     Section 1 of the Fourteenth Amendment to the United States Constitution provides that:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

221.     There is no legitimate, non-racial reason for the challenge and removal procedures.

222.     The challenge and removal procedures were adopted, at least in part, for the purpose of disadvantaging Black voters relative to white voters.  From the outset, Defendants intended, at least in part, to burden and disenfranchise a significant percentage of Black voters eligible to participate in the City of Sparta's November 3, 2015, municipal election.

223.     All of the indicia of discriminatory purpose are present in this case.  There is evidence of substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision, including contemporaneous statements by decision makers.  Statements and communications from key decision makers indicate that they

were aware that the challenges would have a significant effect on the outcome of the Sparta

municipal election and that they supported and assisted Mr. Bevill, who had "promised some

candidates" he would challenge voters he believed did not live in Sparta.  They removed voters

based upon evidence they knew did not meet the requirements of state law.  The BOER held at

least a dozen hearings on the challenge hearings in close proximity to the municipal election.

And, finally, the BOER undermined Mr. Webb's challenges and treated them differently.

224.      By engaging in the acts and the omissions alleged herein, Defendants acted and

continue to act under color of law to deny Plaintiffs their rights that are guaranteed by the

Fourteenth Amendment to the United States Constitution and Section 2 of the Voting Rights Act

and will continue to violate said rights absent relief granted by this Court.

### THIRD CLAIM FOR RELIEF

**(42 U.S.C. § 1983 - Violation of the Equal Protection Clause of the Fourteenth Amendment
to the United States Constitution)**

225.      Plaintiffs re-allege and incorporate by reference each and every allegation

contained in Paragraphs 1 through 224 above as if set forth fully herein.

226.      Defendants, acting under color of state law, are administering a voter challenge

and removal process in Hancock County that lacks uniform standards and processes, severely

burdens and denies equal access to the right to vote, and results in disparate treatment based on

whether they live inside or outside the City of Sparta and the individual who challenged them in

violation of the Equal Protection Clause of the Fourteenth Amendment.

227.      Defendants, acting under color of state law, have deprived and severely burdened

individual plaintiffs of their fundamental right to vote, and threaten to continue doing so in the

future.

228.     The current unequal and arbitrary challenge process in Hancock County serves no compelling state interest, lacks any substantial relationship to any important state interest, and is not rationally related to any legitimate state interest.

## FOURTH CLAIM FOR RELIEF

### (42 U.S.C. § 1983 - Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution)

229.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 228 above as if set forth fully herein.

230.     Defendants, acting under color of state law, are administering a voter challenge and removal process in Hancock County that is permeated with broad-gauged, patent, and fundamental unfairness that denies and severely burdens the fundamental right to vote and violates substantive and procedural Due Process under the Fourteenth Amendment.

231.     Defendants, acting under color of state law, are creating an unreasonably high risk that plaintiffs and others will be erroneously denied the right to vote.  Defendants' actions have also frustrated the purposes of the organizational plaintiffs in ensuring that individuals are able to register to vote, cast a ballot, and have their vote counted.  The challenge and removal process is conducted in an arbitrary manner that lacks standards and disenfranchised a significant percentage of voters who would have otherwise been eligible to participate in the City of Sparta's November 3, 2015, municipal election.

## FIFTH CLAIM FOR RELIEF

### (52 U.S.C. § 10101 and 42 U.S.C. § 1983 – Violation of Title I of the Civil Rights Act)

232.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in Paragraphs 1 through 231 above as if set forth fully herein.

46

233.     Title I of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a), grants rights to

voters by providing, in relevant part:

> (2)  No person acting under color of law shall –
> (A) in determining whether any individual is qualified under State
> law or laws to vote in any election, apply any standard, practice, or
> procedure difference from the standards, practices or procedures
> applied under such law or laws to other individuals within the same
> county, parish, or similar political subdivision who have been found
> by State officials to be qualified to vote. . .

234.     Private litigants may enforce their rights under 52 U.S.C. § 10101(a) by bringing

a suit under 42 U.S.C. § 1983.

235.     Defendants, acting under color of state law, applied different standards, practices,

or procedures in determining whether Black voters were qualified to vote than were applied to

white voters.  The BOER selectively challenged voters who are listed as having different

addresses in Enet and the DDS database, provided different levels of resources and assistance to

different challengers, and used different standards when making probable cause and voter

removal determinations.

236.     Plaintiffs will continue to suffer the violation of their rights as alleged in the

Complaint absent relief granted by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court:

1.     Enter judgment in favor of Plaintiffs and against Defendants on the claim for

relief as alleged in this Complaint;

2.     Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring

that Defendants' challenge and removal procedures (a) violate Section 2 of the Voting Rights

47

Act of 1965, 52 U.S.C. § 10301, (b) were made with a racially discriminatory purpose in

violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and the Fourteenth

Amendment to the United States Constitution; (c) violate the Equal Protection Clause under the

Fourteenth Amendment; (d) violate Plaintiffs' procedural and substantive Due Process rights

under the Fourteenth Amendment; and (e) violate Title I of the Civil Rights Act of 1964, 52

U.S.C. § 10101;

     3.     Grant Plaintiffs preliminary and/or permanent injunctive relief by ordering that

Defendants:

     (a) discontinue the practice of employing challenge procedures that are in violation of the

Voting Rights Act of 1965, the Civil Rights Act of 1964, and the Constitution;

     (b) discontinue the practice of immediately cancelling a voter's registration based upon a

change of address unless the voter provides written notice that he or she has moved;

     (c) restore all voters back to "Active" or "Inactive" status in the voter registration

database, as appropriate, for individuals whose registrations were canceled pursuant to

challenges under O.C.G.A. §§ 21-2-228, 21-2-229, and 21-2-230, and have not been

reactivated by other means, unless Defendants received a specific written request from an

affected voter authorizing the cancellation of his or her registration, or the affected voter

is no longer qualified to vote under Georgia law by reason other than a change of address;

     (d) preliminarily and permanently enjoin the certification of the results of the municipal

election in Sparta to be held on November 3, 2015, until such time as voters who were

removed from the rolls are returned to the rolls;

(e) maintain, preserve, and not destroy until after December 31, 2017, any and all records relating to Defendants' list maintenance programs that have resulted in challenges to voter eligibility based upon a change of address; and

(f) provide a copy of all records concerning Defendants' list maintenance programs that have resulted in challenges to voter eligibility based upon a change of address to plaintiffs until December 31, 2017.

4.     Issue an order pursuant to Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c) requiring Hancock County to obtain preclearance, for a necessary and appropriate period of time, from the Attorney General of the United States for any and all future changes in voting law, upon a determination that Hancock County has shown that the proposed changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color;

5.     Retain jurisdiction over Defendants for such period of time as may be appropriate to ensure Defendants' compliance with relief ordered by this Court;

6.     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to statute; and

7.     Grant Plaintiffs such other and further relief as may be just and equitable.

Respectfully submitted,


/s/ William v. Custer
William V. Custer
Georgia Bar No. 202910
Jennifer B. Dempsey
Georgia Bar No. 217536
Bryan Cave LLP
One Atlantic Center
Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, Georgia 30309-3488

Phone: (404) 572-6600
Fax:     (404) 572-6999
E-mail: bill.custer@bryancave.com
              jennifer.dempsey@bryancave.com

Appearance subject to the filing and approval of
applications for admission *pro hac vice*:

Ezra Rosenberg
New Jersey Bar No. 012671974
Julie M. Houk
California Bar No. 114968
The Lawyers' Committee for
Civil Rights Under Law
1401 New York Avenue NW
Suite 400
Washington, DC 20005
Phone: (202) 662-8345 (Ezra Rosenberg)
Phone: (202) 662-8392 (Julie Houk)
Fax:     (202) 783-0857
Email: erosenberg@lawyerscommittee.org
            jhouk@lawyerscommittee.org

*Attorneys for Plaintiffs*
  *Georgia State Conference of the NAACP*
  *Georgia Coalition for the Peoples' Agenda*
  *Merritt Hubert*
  *Taurus Hubert*
  *Johnny Thornton*
  *Martee Flournoy*
  *Larry Webb*