```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF GEORGIA
 2                       MACON DIVISION

 3                   _____

 4   GEORGIA STATE CONFERENCE OF THE     )
     NAACP, as an organization; GEORGIA  )
 5   COALITION FOR THE PEOPLES' AGENDA,  )
     as an organization; MERRITT HUBERT, )
 6   TAURUS HUBERT, JOHNNY THORNTON,     )
     MARTEE FLOURNOY and LARRY WEBB,     )
 7   PLAINTIFFS,                         )
                                         ) Case No. 5:15-CV-414
 8        vs.                            ) February 2, 2016
                                         ) Macon, Georgia
 9   HANCOCK COUNTY BOARD OF ELECTIONS   )
     AND REGISTRATION; KATHY RANSOM,     )
10   NANCY STEPHENS, LINDA CLAYTON,      )
     ROBERT INGRAM AND JIM YOUMANS, IN   )
11   THEIR OFFICIAL CAPACITIES AS MEMBERS)
     OF THE HANCOCK COUNTY BOARD OF      )
12   ELECTIONS AND REGISTRATION; AND     )
     TIFFANY MEDLOCK, IN HER OFFICIAL    )
13   CAPACITY AS THE HANCOCK COUNTY      )
     ELECTIONS SUPERVISOR, DEFENDANTS.   )
14              _____

15

16              TELEPHONE STATUS CONFERENCE

17

18           BEFORE THE HONORABLE C. ASHLEY ROYAL
             UNITED STATES DISTRICT JUDGE, PRESIDING
19

20

21

22   _____

23                   DARLENE D. FULLER, USCR
                     POST OFFICE BOX 1873
24                   MACON, GA  31202-1873
                       (478) 752-3497
25
```

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:        WILLIAM V. CUSTER, IV
                                 JENNIFER BURCH DEMPSEY
 3                               BRYAN CAVE
                                 1201 W. PEACHTREE ST., NW
 4                               ATLANTA, GA 30309

 5                               JULIE M. HOUK
                                 JOHN M. POWERS
 6                               LAWYERS COMMITTEE
                                 1401 NEW YORK AVENUE, N.W.
 7                               WASHINGTON, DC  20005

 8

 9    FOR THE DEFENDANTS:        BARRY A. FLEMING
                                 F. ADAM NELSON
10                               FLEMING & NELSON, LLP
                                 631 RONALD REAGAN DRIVE, SUITE 201
11                               POST OFFICE BOX 2208
                                 EVANS, GA  30809
12
                                 ANDREA GRANT
13                               ANDREA GRANT, LLC
                                 504 BOWERS STREET
14                               POST OFFICE BOX 60
                                 ROYSTON, GA  30662
15

16

17

18

19

20

21

22

23

24

25
```

1    Macon, Georgia

2    Tuesday, February 2, 2016

3    10:58 a.m.

4                    P R O C E E D I N G S

5              COURTROOM DEPUTY:  My name is Teri Hatcher.  I'm with

6    Judge Royal's Chambers.  Who do I have on the phone already?

7              MS. HOUK:  Julie Houk and John Powers from the

8    lawyers' committee representing the plaintiff.

9              MR. CUSTER:  Bill Custer and Jen Dempsey also

10   representing the plaintiffs.

11             COURTROOM DEPUTY:  Okay.  And I just heard some

12   others chime in.

13             MR. FLEMING:  This is Barry Fleming from Hancock

14   County for the defendants.

15             COURTROOM DEPUTY:  Is Ms. Grant or Mr. Nelson on the

16   line, as well?

17             MR. NELSON:  Mr. Nelson is.

18             THE COURT:  Okay.  All right.  The next voice you

19   hear will be Judge Royal.

20             THE COURT:  Good morning, how are y'all today?

21             COUNSEL COLLECTIVELY:  Morning, Your Honor.

22             THE COURT:  This is a status conference.  We had an

23   initial conference, I don't know how long ago that was, I guess

24   about ten days ago, and I gave some directives.

25             And of course what I was trying to achieve at that

1    time was to speed up discovery and try to get the people back

2    on the voting rolls who were authorized to vote, and also to

3    try to get control of this litigation before it gets to be too

4    expensive and too -- just kind of spins out of control, which

5    looks to me like it could when you're involving so many

6    different people as we seem to have here.

7          And of course I understand that Plaintiffs' lawyer is

8    not satisfied with the information that's been provided or the

9    action that's being taken.  And I've also read the Defendants'

10   status report and the action that has been taken.  And I

11   noticed in particular this chart that is attached to the

12   defendants' response, and that's on Page 6 of 15 and follows

13   thereafter.

14         I'm not exactly clear about how to move this down the

15   way.  I will tell you that what I had in mind, and I thought

16   was clear, was that the County was supposed to be proactive in

17   trying to get these people back on the voter rolls by March the

18   1st, assuming that they were authorized to vote as a matter of

19   law -- as a matter of state law.  And it appears, if I'm

20   understanding everything correctly, that there were a number of

21   letters and a number of calls made since we had the first

22   hearing to these people.  Is that correct?

23         MR. FLEMING:  Yes, Your Honor.  Barry Fleming.

24   That's correct.

25         THE COURT:  Is it to the -- I know the numbers are a

1    little bit confusing here.  You know, we've got 29 out of 35.

2    6 are not mentioned.  And so I'm assuming that the letters and

3    calls went out to the 29, or did it go out to the 35?

4              MS. GRANT:  The letters went out to all 52.

5              THE COURT:  Okay.  All 52, all right.  And what was

6    the response to that?  I mean, I know that you put 2 back on,

7    but there appear to be a number that haven't been put back on

8    at this point.

9              MS. GRANT:  Out of the original -- this is Andrea

10   Grant.  Out of the original 52 hearings, 14 of them resolved

11   themselves prior to this.  For example, one was discovered to

12   be deceased.  Others had a change --

13             THE COURT:  That was before the first phone call;

14   correct?

15             MS. GRANT:  I'm sorry?

16             THE COURT:  The 14 that were properly removed, that

17   was before the phone call?  Or was it after the phone call?

18   That's what I'm trying to understand.

19             MS. GRANT:  I believe some of them were before and

20   some of them were after.

21             THE COURT:  Okay.  Well, I was confused about that.

22             MS. GRANT:  Yes, sir.  Some of them were before and

23   some of them were after.  Then --

24             THE COURT:  Let me stop you right there.  Does the

25   plaintiff agree that these were properly removed?

1          MR. CUSTER:  Your Honor, this is Bill Custer for the

2     plaintiffs.  We probably will agree with most of them.  We just

3     need to see the evidence.

4          THE COURT:  Okay.

5          MR. CUSTER:  Obviously, if there is somebody who's

6     been deceased, we are not going to put them back on the rolls.

7     But if someone's left the state with a -- with the subjective

8     intent to return, that may change our evaluation.  We just need

9     to -- need to know what the proof is.

10         THE COURT:  Well, I'll go straight to that.  I assume

11    that you're not satisfied with the chart that I've referred to

12    just a minute ago.  Because they are -- all the electors' names

13    are here, and then there is information about the fact that

14    there was a hearing, there was notice, there was a hearing

15    date, the reason is given.

16         And for example on the Darrick Barnard, it said that

17    there was a summons signed by the deputy that states that he

18    lives in Baldwin County, and then sworn testimony from Lawson,

19    and then there's a removal letter, and then it says 6 letters

20    and 3 calls.  So are you -- are you saying that you want this

21    information -- that this is not satisfactory?  Or what is it

22    you want beyond that?

23         MR. CUSTER:  Your Honor, let me address it this way.

24    The real problem here is that the defendants are committed to

25    their challenge process.  And that challenge process is

1   fundamentally flawed in several ways, but primarily because for

2   most of these voters on this chart, there was no evidence

3   introduced that would strike at their right to be qualified to

4   vote.

5          Now, let's just -- and let's just look at one of

6   them, just to give you an example of how extreme an approach

7   they've taken.  If you look at Page 5, Maria or Moriah Speights

8   was actually someone who was considered --

9          THE COURT:  Where is that?

10          MR. CUSTER:  -- as recently as Friday by the board.

11   There were four members there.  Two of them voted to put her

12   back on the roll, one against, and one abstained.  But they

13   still didn't put her back on the roll.

14          The rest -- and, again, I am not saying that there

15   aren't going to be some people on chart number -- or excuse me,

16   chart of 29 that we don't agree with.  For instance, there's

17   somebody who says they moved to Virginia.  If that turns out to

18   be true, obviously we're not going to raise a lot of heck about

19   somebody who's left the state.

20          But for most of these, what they did was they went

21   out to the address listed by the voter.  And if the voter

22   wasn't found at that address and didn't respond to mail at that

23   address and hasn't responded to a phone call perhaps that they

24   called on a phone number that was on the original registration,

25   then they took them off the list.  And that --

1              THE COURT:  What were they supposed to do beyond

2     that?  What were they supposed to do beyond that?  That's

3     something that I'm not clear about.

4              MR. CUSTER:  They have to have proof, Your Honor,

5     that the voter is no longer within the jurisdiction and no

6     longer qualified to vote.

7              THE COURT:  And how do they go about -- how do they

8     go about getting that information?  That's my question.

9              MR. CUSTER:  You know, Your Honor, I can't -- I can't

10    tell you that with respect to every voter.  I can only tell you

11    that when we got the information about the voters on Wednesday,

12    we started calling voters and finding voters using that

13    information.  And we quickly found a number of people living in

14    the county that had been improperly struck from the rolls.

15             I can't say how many other ones I will find if I

16    conduct an adequate investigation of all 29 of these people,

17    but I found -- I don't know --

18             How many did we find in the span of three business

19    days, Ms. Houk?

20             MS. HOUK:  We found Ms. Quintina Walker, Johnathan

21    Clayton, Samuel Clayton and one more -- Emma and Jimmy Johnson.

22             MS. GRANT:  Adam, are you on the line?

23             MR. NELSON:  Yes.

24             MS. GRANT:  Perhaps this is a good time to explain to

25    the judge the difference between determining these facts by the

1    state and by Judge Royal, and if it's not an appropriate place

2    to be discussing the individual qualifications at this time.

3         MR. NELSON:  Well, Judge, some of our conversations

4    and going back and forth with what plaintiffs counsel and the

5    defense counsel have been arguing about, I do think that at

6    some point the inquiry would be before the Court as to whether

7    or not there was some -- based on the complaint -- some racial

8    component to why these people were taken off.

9         But I think the law seems to be clear to me that

10   eligibility of voters is left to the states, that the federal

11   courts don't have an inquiry into eligibility outside the realm

12   of where Plaintiffs' case lies.  And I think that's important

13   because where we are now is obviously we have a quickness from

14   the plaintiffs to move forward.

15        I think their case is -- at this point -- our

16   conference today to decide the determination of whether

17   someone's eligible or not eligible, that's opened their case.

18   Doing it now pushes us into a situation, just like the

19   plaintiffs were saying, they don't have information, they can't

20   ferret out whether or not eligibility exists.  So at least to

21   that extent, since we are here today because of the expediency

22   of everything, I don't know that that's the proper inquiry at

23   this point.

24        THE COURT:  Well, I am not inquiring about that to

25   reach any definitive result.  I am trying to figure out how to

1  get the discovery done in this case and how to get these people

2  back on the rolls.  So, you know, I -- you don't really need to

3  tell me what I don't need to know about; you need to answer my

4  questions about what I know about.

5          MS. GRANT:  I have a suggestion.  One of the things

6  that the board did, despite Plaintiffs' contentions, we did

7  strive -- or the board did strive to follow the procedures in

8  228, 229 and 230 wherein you give notice and ask them to

9  bring -- when they're challenged, you ask them to bring proof

10 of indications or factors of residency or their intent to live

11 or be domiciled in a particular location.

12         And all those letters did go out, and the hearings

13 were scheduled, and summonses were attempted to be delivered.

14 Some were delivered, some were unable to be delivered.  The

15 hearings were held, and sometimes people showed up and

16 sometimes people didn't show up.  Per --

17         THE COURT:  You're talking about in 2015?

18         MS. GRANT:  Yes, sir.

19         THE COURT:  Go ahead.

20         MS. GRANT:  No, 2016.

21         THE COURT:  Are you talking about since the telephone

22 conference?

23         MS. GRANT:  I'm sorry?

24         THE COURT:  Are you talking about this is what's

25 happened since I ordered to you do --

1          MS. GRANT:  No, this happened all before this

2     started.

3          THE COURT:  Okay.  Well, that's what I thought.  I

4     thought it was before this started.  Go ahead.

5          MS. GRANT:  It all started so that -- the defendants

6     followed the law in following -- challenging, and they weren't

7     done because of change of address.  Now, the only way I see to

8     restore this is to -- if the plaintiffs feel like somebody's

9     been wrongly removed, is to have new hearings and put them

10    before the board and let the board decide whether or not to --

11    based on additional, new evidence, whether their original

12    decisions were correct.

13         THE COURT:  Well, let me -- and can all that be done

14    by March the 1st?

15         MR. FLEMING:  Your Honor, this is Barry Fleming, if I

16    may.  The March the 1st is the presidential primary date.  The

17    deadline to register to vote was February the 1st.  That's why

18    the -- as you have that report in front of you, we, the

19    defendants, took those extraordinary efforts to reach out to

20    all 52 of those people in any way possible, to find them and

21    make sure, look, come down, register to vote, we want you to be

22    able to vote at the voting polls.  And that report is in front

23    of you.

24         So if there are other people that the plaintiff knows

25    about, and if they want to share a name and address with us,

1    we'll do the same effort to reach out to other people if they

2    want us to, and get them signed up to vote, too.  But they

3    won't be able to vote in the March 1st primary.  The next

4    election is in May with the general primary, but they would be

5    able to then.

6           MR. CUSTER:  Your Honor -- I'm sorry.

7           MS. HOUK:  Your Honor, this is Julie Houk for the

8    plaintiffs.  We advised Ms. Grant and her co-counsel of the

9    names of the individuals I just gave the Court that we found

10   that had evidence showing that they were improperly removed and

11   were still eligible to vote in Hancock County.  We begged them

12   to get back to us and let us know what action they were going

13   to take on those voters.  They were silent.  They refused to

14   return our e-mails in substance as to a single one of them.

15          Then they waited all day yesterday, which was the

16   close of registration, and we asked them for a phone

17   conference.  They never gave us a time to talk to us about

18   those voters before the registration deadline ended.  And for

19   the first time, they let us know what they did at 1:24 in the

20   morning this morning.

21          MS. GRANT:  In all fairness, Your Honor -- Andrea

22   Grant -- Ms. Houk did provide us those names at 4:30 on Friday

23   afternoon.  My board met at 2:00 o'clock on Friday afternoon.

24   And I am without the power to restore any names.  It has to be

25   a board decision.  If we had had them before 2:00 o'clock on

1    Friday afternoon, we could have -- we could have considered

2    them, but there was nothing I could do with them at that point.

3          THE COURT:  Well, let me just ask you.  Just take an

4    example here, Moriah Speights.  I think that's the one that

5    Plaintiff mentioned.  And I am looking at the information here

6    on Page 5, let's see, Chairman Ransom and Secretary Youmans

7    voted in favor.  Member Stephens opposed.  Ingram abstained.

8    The original challenge was brought by Elector Bevill -- we know

9    about that.  What happened on this?  Why didn't she get

10   restored?

11          MS. GRANT:  I can't speak for the entire board, Your

12   Honor, because it has to be a majority decision.  We would have

13   to inquire -- and I am not trying to be evasive -- but we would

14   have to inquire into why Ms. Stephens opposed and why

15   Mr. Ingham abstained.

16          The other concern that I have about all this, too, is

17   we have -- our challengers did not have an opportunity to

18   attend this hearing and prevent -- and to -- this

19   reconsideration and to present additional information.  So we

20   are tromping on some rights of other electors at the same time.

21          THE COURT:  What was the evidence?  Were you at this

22   meeting?

23          MS. GRANT:  I was at this meeting.

24          THE COURT:  What was the evidence related to Moriah

25   Speights?

1          MS. GRANT:  That her mother, Daphne, was one of the

2     deceased persons that was removed from the list.  Her sister

3     was named Daphne -- wait a minute -- yes, Daphne Heath, she's

4     Number 6 in Subsection 2.  She confirmed that Ms. Heath was

5     dead.  Daphne changed her registration -- wait a minute, I'm

6     getting confused here.  I'm getting confused.

7          There was a mother and two sisters.  And Daphne is

8     the dead one and Jarlessia Heath, Number 7, she updated her

9     address.

10          And Moriah -- nobody knew anything about Moriah that

11     would change any of the facts from the hearing that was

12     provided by testimony with Mr. Bevill and Mr. Patillo.

13          THE COURT:  So Moriah herself didn't appear?

14          MS. GRANT:  Did not appear.

15          THE COURT:  Okay.  And are you telling me that the

16     board of electors doesn't know where they are?  Where she is?

17     The board doesn't know where this woman is?

18          MS. GRANT:  Sir, I would have to go back and look at

19     the minutes of the meeting.  I don't know if I was at the

20     original meeting when they considered.  I didn't attend all of

21     them.  So I would have to --

22          THE COURT:  Do the plaintiffs know where she is?

23          MS. HOUK:  Your Honor, we don't.  But, however, if

24     you read what they wrote in their status report, they

25     represented that Ms. Medlock recently contacted Ms. Speights'

1   sister and gave them information about her.  Curiously, none of

2   the facts concerning what information the sister gave

3   Ms. Medlock are revealed in the status report.

4           Then after they spoke to Ms. Speights' sister, they

5   scheduled a hearing to reconsider her removal.  And at that

6   time, two board members apparently felt strongly enough about

7   the evidence that was presented to determine that she should be

8   restored to the rolls.

9           MS. GRANT:  Again, Your Honor, I have -- I have -- I

10  have concerns about us considering facts not in evidence and

11  not having testimony.  But I was at that particular hearing,

12  and Ms. Medlock, the supervisor.  What we did was we had the

13  board members review all of the removals and make suggestions

14  as to which ones -- you know, for example we had one evidence

15  that the board had thought that the house had been burnt down

16  for many years, and that would go in -- if the house had been

17  burnt for ten years and nothing had been done and all the ruins

18  were still on there, that could go to intent of domicile or

19  return.

20          They learned that the house was burned in 2015, and

21  that changed their mind.  They said no, we can't -- we can't

22  come up with the same intent or weigh the same evidence the

23  same.  So we don't -- what we believe is an intent to come

24  back.

25          Now, Ms. Mariah, the -- the supervisor said, "Board,

1    here are two that I suggest.  One is Moriah.  I spoke to her

2    sister.  Her mother is -- Daphne is deceased.  The sister

3    updated her registration and corrected it.  I talked to her

4    about Moriah.  We've had no response.  We've had nothing -- her

5    sister knew nothing where she was living.  Knew nothing about

6    her."  And so the supervisor on her own brought it up for the

7    board to reconsider, based on the prior information and the

8    current information that the supervisor gave sworn testimony,

9    speaking to the sister.

10             THE COURT:  Okay.

11             MR. CUSTER:  But we've got no proof, Your Honor.

12   That's the problem that we have here.  I mean, for all of

13   these, there's no proof that's introduced into any of these

14   proceedings as to a whole host of these voters, that they are

15   not qualified to vote in Hancock County.

16             Instead what these people are doing are putting the

17   burden of proof on these voters.  They are just challenging

18   them, serving them with summons at an address that they may or

19   may not live at any longer, and that's in violation of the

20   Voters Rights Act and the MVRA.

21             And what they want to live and die on is their

22   compliance with state law.  And that's not the end of the

23   question here.  The question is whether they are in violation

24   of federal law and whether we're entitled to an enforcement of

25   federal law to put these people back on the voting rolls.

| | |
|---|---|
| 1 | And that's the fundamental problem we have here. |
| 2 | They won't look at a practical solution.  They are going to |
| 3 | live and die on the hill that they complied with state law, and |
| 4 | we've tried to talk them out of that.  We've tried to adopt a |
| 5 | practical solution to say let's look at these people and find |
| 6 | out who's qualified and who isn't.  And they really won't go |
| 7 | through that analysis, because they feel, as a matter of |
| 8 | litigation strategy, that they have to defend what they did in |
| 9 | these state proceedings, and that's embedded -- |
| 10 | MS. GRANT:  I object to you making comments about our |
| 11 | assuming and making statements about our -- |
| 12 | THE COURT:  Wait just a minute. |
| 13 | MS. GRANT:  -- litigation strategy.  I don't believe |
| 14 | that's appropriate for this conversation. |
| 15 | THE COURT:  All my questions are designed to get at |
| 16 | what the plaintiff needs.  You are making all these |
| 17 | contentions.  You make all the contentions throughout your |
| 18 | status report here about the wrongdoing. |
| 19 | I'm still trying to figure out how to get -- where |
| 20 | the information is and how to get it to you.  There is |
| 21 | information that came from somewhere that made up these charts |
| 22 | as to these various voters.  And so I'm still trying to figure |
| 23 | out what it is that you contend that you need that you haven't |
| 24 | gotten that the defendant actually has. |
| 25 | MR. CUSTER:  Yes, Your Honor. |

1          THE COURT:  Everybody's -- you're sitting here and

2   making these contentions about this and that and what I need to

3   know and what I don't need to know, but I'm trying to get

4   beyond that impasse to get to the place where we can figure out

5   what it is that both sides need in order to move forward.  And

6   y'all haven't enlightened me on that at this point.

7          MR. CUSTER:  Yes, Your Honor, and I appreciate the

8   Court's concern about that.  Let's go back to the Court's

9   order.  The Court ordered that the ENET records be produced and

10   on Wednesday of last week they partially complied with that

11   order.  They produced some of the ENET records for some of the

12   purged voters.  We're still missing 7 or 8 ENET records of the

13   purged voters.

14          Those records were redacted in a way that prevented

15   us from seeing some of the information; I believe birth dates

16   and Social Security numbers.  And without those, it's very

17   difficult for us to conduct an investigation and track these 52

18   people down.  We were able to track down, as I said, and as

19   Ms. Houk pointed out, a number of these people in a very short

20   period of time between Wednesday and Friday.  And so we know

21   that there are, in fact, a number of people who have been

22   wrongfully purged from the list.

23          We would have to go -- one, we would have to have

24   complete records.  And then we would have to have time to go

25   out and try and track down each of these 52 people and find out

1   where they are currently.  And that's the only way I know to do

2   it, Your Honor.

3           Our concern is a matter of timing.  We don't know

4   that we'll be able -- and, in fact, we've already had one

5   deadline pass.  Our opponents are playing a game of delay.

6   They have delayed producing documents to us for two months so

7   that we couldn't go out and conduct that investigation.  We

8   are -- we, in essence, were put in the position of having to

9   track down 52 people in three days with incomplete information.

10  And we weren't able to do that.  And I don't know whether we

11  will be able to track down the rest of them before the next

12  deadline passes.

13          And what -- and so the only -- the only relief

14  we're -- we're left with is an injunction to say -- and I

15  understand we're going to have to prove that before you, and we

16  understand our burden of proof, Your Honor.  But our only other

17  alternative is to prove to you that they have violated the

18  federal laws by taking these people off in this manner, and

19  that we are entitled to an injunction putting them back on

20  until such time as we can have a complete hearing on the

21  matter.

22          MR. FLEMING:  Your Honor, this is Barry Fleming, if I

23  may.  Mr. Custer, by his own admission, has just said that

24  we've given him about 45 of these -- he said 6 or 7 he didn't

25  have -- 45 or so of all the information he wanted on the 52

1   people that were taken off the roll.  Your Honor's got in front

2   of you the extraordinary efforts that we brought in extra

3   people to reach out to everybody who have been, we think,

4   properly taken off, to find where they were and if they needed

5   to be put back on.

6          And many of them we found were properly taken off or

7   either registered in other counties or were deceased and so

8   forth and so on.  That was the emergency that brought us to you

9   with all their motions initially, as I understand it.

10         At this point, you know, if they give us the name of

11  the 7 that they don't have the complete information on, or

12  however many it is -- I thought we had everything to them; you

13  know, Ms. Grant, you know, thought that we had -- we'll get

14  those to them as quick as we can.

15         MS. GRANT:  Absolutely.

16         MR. FLEMING:  There is other information that they

17  are requesting.  They don't want just the 52 that were taken

18  off.  There was over -- correct me if I'm wrong, Ms. Grant --

19  numerous more people that were also challenged that the board

20  did not take off.

21         THE COURT:  Right.  I understand that.  I don't think

22  we need to get to that right now.  We can move to that later.

23         MR. FLEMING:  That's part of the process, and we can

24  work on that, too, Your Honor, but we have to prioritize -- our

25  priority was the 52 that were taken off, and that's what we had

1   been struggling to get done up to this point because the

2   deadline was yesterday.

3          THE COURT:  Well, you've got 7 or 8 missing.

4          MS. GRANT:  And we will be happy to review that.  And

5   it is a work in progress.  And this few last numbers we have

6   have been extraordinary measures, and I will be happy to get

7   with them and get those that they say that are missing.

8          THE COURT:  Does the plaintiff know the names of the

9   7 or 8 or is it just a matter of arithmetic?

10         MR. CUSTER:  No, we know the names, Your Honor.

11         THE COURT:  Okay.

12         MR. CUSTER:  And we gave them the names last week.

13   Middle of the week, when we realized we had been given an

14   incomplete set of the documents.

15         THE COURT:  Okay.

16         MS. GRANT:  I will be happy to go back and review

17   that.  It was my recollection, and I don't want to get into

18   disputes at this point, that it was Friday afternoon.  But I

19   will be happy to go.

20         And I know there was one that was requested that, the

21   minute I got the e-mail, I turned around and -- happened to

22   have been in Hancock County and turned around and got it right

23   to them.

24         And I would be remiss in not pointing out, Your

25   Honor, that in addition to all these ENET records we have

1    produced thousands of pages of minutes, we have produced pages

2    of letters that -- removal letters, notice of hearing letters,

3    and all the other documents identifying these people.  So at

4    this point, we have provided them with all the information that

5    we have other than the date of birth and Social Security

6    numbers which we believe are properly redacted from the ENET

7    records.

8              THE COURT:  Well, that's the next thing I want to

9    talk to you about, these redactions.  Are the only things that

10   are redacted the date of birth and the Social Security numbers?

11             MS. HOUK:  Your Honor -- Julie Houk -- also driver's

12   license numbers if the voter used that for their registration

13   are redacted.

14             THE COURT:  "Driver's license number"?  Is that what

15   you said?  I couldn't quite hear you.

16             MS. HOUK:  Yes, Your Honor.

17             MR. CUSTER:  Yes, Your Honor.

18             THE COURT:  Well, what difference do those three --

19   what difference does that make to you?

20             MS. HOUK:  Well, Your Honor, the date of birth is

21   important because, you know, people have common last names and

22   first names all around Georgia.  And to be able to distinguish

23   and narrow down who a particular Joe Smith would be, it would

24   be helpful to have their date of birth to isolate the

25   individual.

 1             THE COURT:  What's the problem on the defense side of

 2   giving the date of birth?

 3             MS. GRANT:  Your Honor, I have to check.  We were

 4   redacting based on state law of what we could -- number one,

 5   between Open Records and there have been specific statutes in

 6   the election statute regarding what information can be given

 7   and what cannot.  And we were redacting it based on that, and I

 8   would have to get you that information.

 9             THE COURT:  Well, I mean, I don't see the problem

10   with that.  I can see a problem with the Social Security

11   number.

12             MR. CUSTER:  Can we have last 4 digits of the Social,

13   Your Honor?

14             MS. GRANT:  Your Honor, I would respectfully request

15   that you give me an opportunity to look at the Open Records Law

16   as well as the -- provide you with the statute that applies to

17   that, and let's double check it to make sure that we are not

18   being amiss.  There is a big issue going on with the Secretary

19   of State where information -- I believe you know -- has been

20   leaked that was improper.  And I would hate to run afoul of

21   giving out information that we should not.

22             THE COURT:  Well, of course the problem is, as a

23   federal judge, I see a lot of fraud.  And it's troubling to

24   turn these Social Security numbers out.  And I really don't

25   understand, if you have the date of birth, why you need the

1   Social Security number anyway.  Or the driver's license number.
2   I don't want to say I'm --
3           MR. CUSTER:  Your Honor, when we've run searches --
4   there are a lot of databases out there to find people, and I
5   don't know if you've used things like PeopleFinder out there.
6           THE COURT:  No.
7           MR. CUSTER:  But you would just be shocked at how
8   many Bill Custers there are in the state of Georgia.  I thought
9   it was an unusual name, but when I start poking around, I find
10  there are a number of them around the state.  And it's easy for
11  us to eliminate people if we have either the date of birth or
12  the Social Security number.  Both is better.  Because most of
13  these services have those, and if you can just give us the last
14  four numbers of the social, I think that avoids the fraud
15  concern and it allows us to zero in on the people we really
16  need to find.
17          THE COURT:  Well, I am going to give her the
18  opportunity to respond as she requested on that.  I think I am
19  going to require you to give the birth dates, though.  I think
20  that's a reasonable request, the date of birth.  And I think
21  that --
22          MS. GRANT:  To provide -- if I may mirror back your
23  language, you said that we are to provide the date of birth on
24  the ENET records, and that you will give me an opportunity to
25  respond regarding the driver's license and the last four

1    numbers of the Social Security number.

2              THE COURT:  Correct.

3              MS. GRANT:  Okay.

4              THE COURT:  All right.  So if you get the ENET

5    records on the 7 or 8 that are missing --

6              MS. GRANT:  Correct.

7              THE COURT:  -- and if -- and I'm talking to the

8    plaintiffs now -- and if you get at least one fundamental

9    identifier -- I know you want more, but if you get at least one

10   fundamental identifier, what else do you need?

11             MR. CUSTER:  The DDS, the driver's license number.

12             THE COURT:  I'm just saying one identifier.  So that

13   would be date of birth, that would be Social Security number or

14   that would be driver's license.  I am going to give her the

15   opportunity to tell me about the Social Security, and I will

16   also give her the opportunity to tell me about the driver's

17   license number.

18             MR. CUSTER:  Okay.

19             THE COURT:  So --

20             MS. HOUK:  And Your Honor -- this is Julie Houk for

21   the plaintiffs -- we would also want the contact information

22   that they've already developed so that we can go out and test

23   out whether or not these people had an intention to abandon

24   their voting domicile in Hancock County or not.  The mere fact

25   that somebody might be staying over the line in Baldwin County

1  does not necessarily mean that they gave up their eligibility

2  to vote in Hancock County.  So we'd like to have the

3  opportunity to explore those contacts a little further and

4  satisfy ourselves that those individuals are not eligible to

5  vote.

6          THE COURT:  Well, I think that's a reasonable

7  request, so provide whatever contact information you have.  I

8  mean, it looks like -- I mean, as I look down through your

9  chart, there are a number of letters and calls.  I mean, here

10  are nine letters to Crystal Brown and two calls.

11          MS. GRANT:  That is correct, Your Honor.  And just to

12  be clear, we have, through all the other records, up to date --

13  before this last -- I guess you would call it campaign, we have

14  provided the other records for all -- they had requested all

15  the letters sent, all the repeal -- or the removal letters,

16  challenge letters.  And we have already provided all those.

17          So what I can do is make copies of the letters and

18  the copies of the scripts with the information that was used

19  for this last round of contacts.  But I would respectfully ask

20  that they reimburse the Board of Elections and Registration

21  pursuant to the usual Open Records Request Act.

22          THE COURT:  Well, I think that they can reimburse

23  you.  I think that would be appropriate.  I think that, you

24  know, you keep referring to the Open Records Act as though it's

25  some kind of shield.  I don't know if that's what your

1    contention is or not.  But we've got litigation here, and this

2    is discovery.  We're talking about in the litigation, and this

3    is what I'm ordering.

4              MS. GRANT:  Okay.  I think we were unclear whether

5    this is related to the -- to Open Records or discovery, and you

6    just clarified that for us.

7              THE COURT:  Okay.  Okay.  What else?  I mean, I think

8    we're making some progress here.  What else do we need to talk

9    about in terms of moving forward?  I mean, is this -- we're

10   going to have another conference, I'm thinking about

11   probably -- next Tuesday, a week from today.

12             MR. CUSTER:  Your Honor, I think that would be

13   advisable.  I think what we're -- what we probably should talk

14   about is this situation which is going to arise as to some of

15   these voters.  I feel relatively confident that there's some of

16   these voters that we are not going to be able to find between

17   now and next Tuesday.

18             THE COURT:  I am confident there are some you're

19   never going to be able to find.

20             MR. CUSTER:  No, that's -- I don't doubt that at all,

21   Your Honor.  I think that that is -- is not an uncommon thing

22   when you take a sampling of the voter list --

23             THE COURT:  Sure.

24             MR. CUSTER:  -- in a particular community.

25             THE COURT:  Exactly.

1          MR. CUSTER:  But the question is going to come, then,

2     if -- if you can't -- if we can't say what's happened to them

3     and they can't say what's happened to them, whether they can

4     lawfully strike those jurors from the list with no proof that

5     these voters have intended to change their domicile.  And I

6     think that's going to be the legal question that's left at the

7     end of the day.  And whether it's state law or federal law or

8     both, we don't think that they can strike those jurors from the

9     list without some proof.

10         THE COURT:  Well, I understand that that's your

11    position, and I understand that that's ultimately the issue in

12    the case.  But now -- what I'm talking about now is the

13    mechanics of moving forward.  I am just trying to move forward.

14    I am trying to keep this on track.  And so is there anything

15    you want to recommend about that?  That moves this case

16    forward?

17         MR. CUSTER:  Your Honor, I -- I wonder if we

18    shouldn't be prepared to brief that issue and -- and I wonder

19    if we shouldn't anticipate, simply for planning purposes, Your

20    Honor, that that is going to be an issue that's left at the end

21    of our investigation.

22         And so -- but the reason I say that is because we've

23    still got these deadline problems.  And those are foremost in

24    our minds.  We want to get this resolved before the deadline,

25    one way or the other.  All right.  And -- and in order to do

1    that, in order to be ready to brief that issue fully before the

2    deadlines--and March 1 is one of those deadlines--we are going

3    to need some discovery.

4           MR. FLEMING:  Your Honor, this is Barry Fleming for

5    Hancock County.  You know, Mr. Custer is talking about

6    discovery in the case.  And, obviously, Your Honor is helping

7    us move through some of the issues from the Open Records

8    requests that we are now turning into discovery.

9           But at this point in the case, they did ask for some

10   folks to be deposed.  And that was months ago -- or much

11   earlier than normal in litigation, because of this pending

12   deadline of February the 1st to get people registered.  We've

13   already taken extraordinary efforts to get that done.  At this

14   point I don't think we have any interrogatories or any requests

15   for production except for the Open Records Request we've been

16   talking about from the -- from the plaintiffs.

17          And also, at this point, if they have people that

18   they want to depose, you know, we're into the discovery phase

19   of it now.  The only deadline that we have here is making sure

20   people get to register to vote for now the upcoming May

21   primary.  And I think we've got plenty of time for them to give

22   us any information they have, and we will reach out as we have

23   to anybody else.

24          But I think at this point we're now into the normal

25   phases of discovery.  And with the exception of the Open

1    Records Request we've been talking about, and the crisis

2    deadline, so to speak, of February the 1st, I don't know that

3    we have to declare anything out of the ordinary as far as

4    litigation and the normal rules of discovery that we move

5    forward.  Does that make sense, Your Honor?  What I'm trying to

6    say?

7              THE COURT:  I understand what you're saying, but you

8    need to remember something that I said at the last hearing.

9              MR. FLEMING:  Yes, sir.

10             THE COURT:  And that is that I don't want to be in a

11   situation or I don't want y'all to find yourselves in a

12   situation in which you go out -- the plaintiff goes out and

13   takes some depositions, and then gets some more records, and

14   then says:  Oh, we have more records, and now we have to go

15   back and redepose these people.

16             And this -- this is a reality.  This is something

17   that I have to deal with.  And so that's one of the main

18   reasons I've been putting the pressure on the defendant to get

19   all the information that is gettable and give it to the

20   plaintiff so that part of it can be cleaned up.  So when

21   depositions are taken, they only have to be taken one time.

22             MR. FLEMING:  And, Your Honor, I appreciate that.  In

23   our brief time limit, we had 52 people taken off the rolls, and

24   there's been extraordinary efforts now to reach out to those

25   and get them back on.  And so, you know, that was the crisis

1    here.  And I think we've almost moved past that.  And so -- I'm

2    sorry.

3              THE COURT:  Let me ask you this.  Have -- has every

4    one been contacted and given an opportunity to be back on the

5    rolls or not?  Have you -- because my instructions --

6              MR. FLEMING:  Let me respond to that, Your Honor, but

7    I think the answer is yes, we have done everything we could.

8              MS. GRANT:  We've done everything humanly possible.

9    We also bought one of those software -- computer softwares to

10   locate people, and before -- even before the hearings, we had

11   sent out numerous times in 2015, prior staff and current staff

12   trying to reach out to people.  So this has been an ongoing

13   event to try to reach out to people to get them properly

14   registered.

15             MR. FLEMING:  Your Honor, the answer to the Judge's

16   question is yes, we have used multiple ways that we have

17   described to touch all 52 people.

18             MS. GRANT:  We can't say we've touched all 52 people,

19   but we have made efforts to reach all 52.

20             THE COURT:  I understand.

21             MR. FLEMING:  But if the plaintiffs have something,

22   Your Honor, that they say, "We know where Joe Blow is, try

23   calling this number," we'll do that too.

24             THE COURT:  That needs to be done.  If you have any

25   information -- if the plaintiff has any information, that needs

1    to be turned over, too.

2           MR. CUSTER:  Your Honor, we have done that.

3           THE COURT:  Okay.

4           MR. CUSTER:  And as Ms. Houk has already said, those

5    people are not on the rolls.  Even though we've given them that

6    information.  And I promise you the minute we find other

7    qualified voters, we will give them those names, too.

8           THE COURT:  Okay.  Well, what --

9           MR. FLEMING:  We're only talking about 52 people?

10          52 people; right, Bill?

11          MR. CUSTER:  Well, you're right.  Well, it's not the

12   entire issue, because in order for us to prosecute our case, we

13   do need the ENET records on the other challenged voters.

14          MR. FLEMING:  And, Your Honor, we had already talked

15   about that beforehand.  We were doing our darndest to get

16   everything done by today and yesterday's deadline, and we've

17   already discussed keeping the part-time staff we brought on to

18   continue to do the laborious process, which is to go through

19   and get all these people that they want information on that

20   were not taken off the rolls.

21          THE COURT:  Right.  But there's nothing --

22          MR. FLEMING:  If that's what they're talking about.

23          THE COURT:  -- nothing that I --

24          MR. FLEMING:  They're talking about people that were

25   not taken off that they want information on.

1          THE COURT:  -- nothing that I can see --

2          MS. HOUK:  We all can't hear both at the same time.

3          THE COURT:  Nothing that I've said changes your

4     responsibility to provide that information.  I understand that

5     that's down the road in terms of when it might apply in the

6     effort that I've been trying to achieve here to get these

7     people back on the rolls.

8          But I want to -- I want to go back and hear from

9     Plaintiff's side about my concern about completing the paper

10    discovery so we don't have to do depositions twice.

11         MR. CUSTER:  Your Honor, other than the challenged

12    voters, but not removed voters, I'm going to ask Ms. Houk if I

13    have omitted anything else that we need in the way of paper.

14    Because I think once we get that, we're pretty close to ready

15    to go into depositions.

16         THE COURT:  Okay.  Well, let's do this.  Let's -- in

17    a week we will have another telephone conference, and we'll

18    make sure that everything is completed as I have directed.  And

19    then we'll decide about how to proceed from there with

20    discovery and briefing.  Deposition discovery.  Okay?

21         MS. GRANT:  You got it.

22         MR. FLEMING:  Thank you, Your Honor.

23         MS. GRANT:  Thank you.  Good-bye, everybody.

24         THE COURT:  Anything further?  Thank you.

25       (Proceedings concluded at 11:45 a.m.)

1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, Darlene D Fuller, Federal Official Realtime Court

6    Reporter, in and for the United States District Court for the

7    Middle District of Georgia, do hereby certify that pursuant to

8    Section 753, Title 28, United States Code, that the foregoing

9    is a true and correct transcript of the stenographically

10   reported proceedings held in the above-entitled matter and that

11   the transcript page format is in conformance with the

12   regulations of the Judicial Conference of the United States

13

14                         Dated this 4th day of February, 2016

15

16                              *Darlene D. Fuller*

17                         _____
                           Darlene D. Fuller, RPR, CRR, RMR
18                         NCRA No. 5803
                           Federal Official Court Reporter
19                         Georgia CCR 5641-3440-5157-6832
                           Michigan Certification CSR-0929
20

21

22

23

24

25